(January 28, 2010)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent v CARLOS REYES, Appellant. [896 NYS2d 301]—

At a pretrial hearing on defendant's motion to suppress, arresting police officer Peralta testified that: on August 26, 2007, he and his partner received a radio dispatch in their patrol car that a 911 call had been received "about a dispute with a knife" at a location at St. Nicholas Avenue in Manhattan. The officers had no description of the alleged perpetrator and were not told the identity of the 911 caller.

When the officers arrived at the location, Peralta observed two men standing in front of a store; they pointed at defendant, who was walking away from them down the middle of the street, and said, "That's him, that's him." Without first speaking to the men, the officers approached defendant and attempted to apprehend him, but he resisted and fled into a nearby apartment building.

The officers were admitted into the building and directed to an apartment, whose front door was latched and could only be opened a few inches. After Peralta's partner reached inside to unlatch the door and defendant tried to bar his entry, the officers sprayed Mace on defendant and kicked the door open. Defendant exited the apartment through a window and hid in the basement of the building, where the officers arrested and searched him. The officers found a gravity knife and an imitation revolver on defendant's person that they had not observed before.

Later that evening, Peralta spoke to the men he had seen

standing in front of the store, who it turned out were its owners. They now told Peralta, for the first time, that defendant had stolen lottery tickets from the store, and then returned with winning tickets which they refused to honor. When defendant displayed what they thought was a revolver, they called the police. The owners were standing outside the store when the officers arrived, and pointed out defendant.

Before trial, defendant moved for an order suppressing the gravity knife and the imitation revolver that the officers seized, as well as statements that defendant made to the police after his arrest, on the ground that they lacked probable cause to stop, arrest and search him. The court denied the suppression motion, finding that the officers' knowledge of the 911 call about a knife dispute, when coupled with the store owners' pointing to defendant when the officers arrived at the scene, gave them reasonable suspicion that defendant was involved in the dispute, which escalated when defendant took flight.*

The motion to suppress should have been granted because the officers lacked valid grounds to forcibly detain defendant on the street and then pursue him when he fled. In evaluating the propriety of the police action, we must consider whether it was justified at its inception and whether it was reasonably related in scope to the circumstances leading to the encounter (*People v De Bour*, 40 NY2d 210, 215 [1976]; *People v Cantor*, 36 NY2d 106, 111 [1975]). In *De Bour*, the Court of Appeals set forth a four-level test for evaluating street encounters that the police initiate. The first three levels are relevant: level one permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality; level two—the common-law right of inquiry—permits a somewhat greater intrusion, short of a forcible seizure, and requires a founded suspicion that criminal activity is afoot; level three, authorizing an officer to forcibly stop and detain an individual, requires a reasonable suspicion that the particular individual was involved in a felony or misdemeanor (40 NY2d at 223; *see also People v Hollman*, 79 NY2d 181, 184-185 [1992]).

Flight alone, even if accompanied with equivocal circumstances that would justify a police request for information, does not establish reasonable suspicion of criminality and is insufficient to justify pursuit, although it may give rise to reasonable

---

* After the court's decision, defendant pleaded guilty to attempted robbery in the third degree. However, as the People concede, defendant did not waive his right to appeal the suppression ruling since the court did not explain the appeal waiver at any time and defendant did not sign a written waiver.

suspicion if combined with other specific circumstances indicating the suspect's possible engagement in criminal activity (*People v Holmes*, 81 NY2d 1056, 1057-1058 [1993]). Specific circumstances could include a description of the perpetrator or the alleged crime (*see People v Woods*, 98 NY2d 627 [2002]). Here there were no such circumstances.

When the officers arrived at the scene, no criminal activity was in progress. They arrived knowing only that a 911 call had been received about a vaguely described dispute with a knife; they lacked a description of the suspect and did not know who had called the police. The two unidentified men they encountered pointed out defendant without accusing him of any specific acts. Neither defendant's knife nor his imitation revolver was visible to the officers, and he was not engaged in any suspicious activity.

Under these circumstances, the officers would have been justified in conducting a level one inquiry by attempting to question defendant to clarify the situation, or in conducting a level two inquiry under the founded suspicion that defendant was involved in criminal activity. However, the officers' attempted detention of defendant when he tried to leave the location and their pursuit of him into the apartment building constituted an unjustified level three forcible seizure because the police lacked reasonable suspicion that defendant had committed a crime.

In *Matter of Manuel D.* (19 AD3d 128 [2005], *lv denied* 5 NY3d 714 [2005]), this Court found, under similar circumstances, that the police had an insufficient basis for chasing after and arresting a fleeing suspect and charging him with resisting arrest. The officers in *Manuel D.* responded to a radio dispatch about a report of a possible burglary in progress at a particular location; they lacked any description of the alleged perpetrators and did not know whether the caller was reliable. When the officers approached the suspect, he was not acting suspiciously, but he fled when the officers questioned his companion.

While, as the dissent points out, it can be discerned from the case law of this Court that "drawing the attention of the police to a person leaving a scene can provide reasonable suspicion" of criminality justifying a forcible seizure, we have never found that the fact that attention was drawn, by itself, is sufficient to give rise to reasonable suspicion. We have instead adhered to the well established principle that whether the police have reasonable suspicion depends on the entire circumstances of each case (*see People v Evans*, 65 NY2d 629 [1985]).

In the cases on which the dissent relies, where reasonable suspicion was found, various incriminating factors were present

in addition to a third party's direction of the police's attention to the suspect. These factors included the suspect's matching a description (*People v Jenkins*, 44 AD3d 400 [2007], *lv denied* 9 NY3d 1007 [2007] [two black male suspects observed leaving a delicatessen by police on lookout for two black men who had been robbing delicatessens in the area]; *People v Davila*, 37 AD3d 305 [2007], *lv denied* 9 NY3d 842 [2007] [suspect fit description of perpetrator of violent crime]; *People v Cephas*, 240 AD2d 169 [1997], *lv denied* 90 NY2d 938 [1997] [suspect was only one of three people in vicinity who matched a description of a black male wearing a brown jacket]). In some cases, the police observed the suspect in close proximity to recent, definite criminal activity (*People v Rosa*, 67 AD3d 440 [2009] [immediately after hearing gunfire, officer saw several people pointing at defendant, who was very close to the gunfire, and saw victim lying on ground]; *Davila*, 37 AD3d at 306 [after receiving a report that a violent crime had just been committed in a park, police saw suspect near the park]; *People v Dickerson*, 238 AD2d 147 [1997], *lv denied* 90 NY2d 857 [1997] [police arrived at scene and observed suspect less than 30 seconds after receiving report]; *People v Hurtado*, 160 AD2d 654 [1990], *lv denied* 76 NY2d 789 [1990] [after hearing gunshots, officers saw third party drawing suspect to their attention]).

In this case, the store owners' direction of the officers' attention to the suspect without relating it to any specific event did not provide a basis for the officers' reasonable suspicion. Accordingly, we find that the suppression motion should have been granted. Concur—Catterson, Acosta and Freedman, JJ.

Sweeny, J.P., and Buckley, J., dissent in a memorandum by Buckley, J. as follows: Veteran Police Officer Peralta, who had participated in approximately 200 arrests, testified at the suppression hearing that he and his partner were on uniformed patrol in a marked car when they received a radio run of a dispute involving a knife or possibly a gun at a location in Manhattan. When the officers arrived at the scene and exited their car, two men, standing in front of a store at the address specified in the radio run, pointed at defendant, who was walking away in the middle of the street, and stated, "That's him, that's him." The officers approached and attempted to apprehend defendant, who struggled and fled into a nearby apartment building.

A building resident let the officers in and directed them to a particular apartment. The officers could only open the door a few inches, since it was chained. As Officer Peralta's partner reached in to unlatch the chain, defendant closed the door on

his arm. The officer sprayed Mace and kicked the door in. Defendant fled through a window to the basement, where the officers found him hiding behind some pipes. As the officers took defendant into custody, he protested, "I didn't do it, I didn't do it." The officers found a gravity knife and an imitation revolver in defendant's pocket. Subsequently, the police spoke with the two men who had directed their attention to defendant. They explained that they were the store owners and had made the 911 call following an incident with defendant.

I would affirm the hearing court's finding that the police had reasonable suspicion to pursue and detain defendant, who was departing the scene while two people called the officers' attention to him. Defendant objects that the two men did not expressly tell the officers he had committed a crime. However, the officers reasonably interpreted the unsolicited pointing and exclamation, "That's him, that's him," by the men standing in front of the precise address relayed in the radio transmission, as accusatory (*see People v Davila*, 37 AD3d 305 [2007], *lv denied* 9 NY3d 842 [2007]), rather than a revelation of an epiphany or some other criminologically inapplicable statement. Under appropriate circumstances, even volunteered pointing alone can be "interpreted as a nonverbal accusation that has often been recognized as a significant factor justifying police action" (*People v Rosa*, 67 AD3d 440 [2009]).

*Matter of Manuel D.* (19 AD3d 128 [2005], *lv denied* 5 NY3d 714 [2005]), relied on by the majority, bears little resemblance to the instant case. In *Manuel D.*, the officers received a radio communication of a burglary involving four males at a certain residence. Arriving at the scene, the police saw three men in the vicinity of a parked car, whom they approached and asked, "what's going on, guys." One individual responded, "nothing," at which point the appellant fled. (*Id.* at 129.) The police gave chase and arrested the appellant, who was found guilty of resisting arrest. Notably absent from that fact pattern is anyone directing the officers' attention to the appellant in an accusatory manner, such as occurred here. Had Officer Peralta pursued defendant merely upon sighting him or upon flight, *Manuel D.* would be instructive.

The instant case is more akin to *People v Cephas* (240 AD2d 169 [1997], *lv denied* 90 NY2d 938 [1997]), where "[t]he police had reasonable suspicion to stop and detain defendant, who matched the radio transmission, received seconds earlier, of a black male wearing a brown jacket, and who was the only person in the vicinity, other than a man and a woman who were both standing on the steps of the building indicated in the radio run

and were pointing at the defendant and telling the police 'that's him' " (citation omitted).

Similarly, in *People v Jenkins* (44 AD3d 400 [2007], *lv denied* 9 NY3d 1007 [2007]), during an early November morning, the police were patrolling an area where there had been a pattern of delicatessen robberies by two black men using a getaway car; two black men exited a delicatessen, and one of them removed a ski mask. A man followed them out of the store, looked at the officers, and pointed at the two men, which provided reasonable suspicion that a crime had been committed.

The vague descriptions of "a black male wearing a brown jacket" in *Cephas* and "two black men" with a getaway car in *Jenkins* (at 401) do not render those cases inapposite; the salient fact is that people directed the officers' attention to the defendant under circumstances that raised a reasonable suspicion of criminality. Indeed, in *People v Dickerson* (238 AD2d 147 [1997], *lv denied* 90 NY2d 857 [1997]), there was a radio report of a man, of unspecified description, with a gun in a particular restaurant. As the police approached the location, a man in the street told them, "the man you're looking for is in the restaurant" (*id.* at 148), and as they entered, a person behind the counter pointed at the defendant. Neither person explicitly stated that he was the one who had telephoned the police or that the defendant possessed a firearm; nevertheless, the unsolicited declaration and pointing were found to provide reasonable suspicion. Under the circumstances, the pointing and statement, "That's him, that's him" in the present case was the functional equivalent of the pointing and statement "the man you're looking for is in the restaurant" in *Dickerson*.

This Court has consistently found that drawing the attention of the police to a person leaving a scene can provide reasonable suspicion (*see Rosa*, 67 AD3d 440 [2009]; *Davila*, 37 AD3d 305 [2007]; *People v Brown*, 266 AD2d 77 [1999], *lv denied* 95 NY2d 794 [2000]; *People v Lopez*, 258 AD2d 388 [1999], *lv denied* 93 NY2d 1022 [1999]; *People v Hurtado*, 160 AD2d 654 [1990], *lv denied* 76 NY2d 789 [1990]). While *Davila*, *Brown*, and *Lopez*, involved one or more people chasing the defendant while waving at the police or pointing, civilian pursuit is not a requirement for reasonable suspicion. For example, in *Rosa*, an officer heard gunshots, and in close temporal and spatial proximity thereto saw several people pointing at the defendant, who was walking away and looking over his shoulder. Similarly, in *Hurtado* (at 654), the police heard gunshots and saw a store manager pointing at the defendant's vehicle and yelling, "That's him, get him."

The overriding principle in all those cases is that the bystanders' verbal or nonverbal expressions could reasonably be viewed as communicating that the defendant had committed a crime. I would follow those precedents and affirm the determination that there was reasonable suspicion.