[20 NYS3d 345]

The People of the State of New York, Respondent, v Mark Nonni, Appellant.

The People of the State of New York, Respondent, v Lawrence Parker, Appellant.

First Department, November 5, 2015

## APPEARANCES OF COUNSEL

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Nicolas Schumann-Ortega* of counsel), for Mark Nonni, appellant.

*Steven Banks, The Legal Aid Society*, New York City (*Lorraine Maddalo* of counsel), for Lawrence Parker, appellant.

*Mark Nonni*, appellant pro se.

*Robert T. Johnson, District Attorney*, Bronx (*Rebecca L. Johannesen* and *Nancy D. Killian* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.P.

Police saw defendants leaving the property of a private country club at which a burglary had been reported just five minutes before. When the police approached defendants to make inquiries, defendants fled, leading to their apprehension and arrest. The country club's live-in caretaker subsequently identified defendants as the men who, after obtaining entry to the clubhouse on a business pretext, pulled out knives, threatened to kill the caretaker, pressed a knife against his kidney area, took $3,000 in cash, and left the caretaker bound up with duct tape.

Having been convicted by a jury after trial, defendants appeal, not challenging their convictions on legal sufficiency or weight-of-the-evidence grounds, but contending that certain evidence used against them at trial was improperly obtained through the police actions that led to their arrest. This argument, like the remainder of defendants' appellate contentions, is without merit. The court properly denied defendants' suppression motions. We conclude that each of the successive police actions at issue was justified by the requisite level of suspicion.

██ Five minutes after receiving a radio run reporting a burglary in progress, the police responded to the location. This was a private, gated country club, and the police were aware that it was the specific location mentioned in the radio message; to the extent defendants are contending otherwise, those arguments are unsupported by the record. The police saw defendants on the club's private driveway, walking toward the

street, while carrying bags, and no one else was present. At this point, the police had at least a founded suspicion that defendants were involved with the burglary, warranting a level-two common-law inquiry (*People v De Bour*, 40 NY2d 210, 223 [1976]). In contrast to a level-one inquiry, which merely seeks information based on objective, credible reasons not necessarily indicative of criminality (*id.*), a level-two inquiry entails "more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation" (*People v Hollman*, 79 NY2d 181, 185 [1992]). Here, the police, when they first saw the two defendants alone on gated private property in a secluded residential area, at the precise location at which a burglary had been reported minutes before, had a founded suspicion of criminality that permitted them to make a level-two inquiry. Again, defendants were not walking on a public thoroughfare in the vicinity of the reported burglary. Instead, when first observed by the police, they were walking down the private driveway leading to the street from the premises reported just minutes before to have been burglarized, with no one else in sight.

In arguing that only a level-one request for information was warranted when the police first saw defendants, the dissent mischaracterizes the record in asserting that defendants, when first sighted, "were observed to be *in the vicinity* of a country club" (emphasis added). In fact, the officers testified that defendants were first observed on the private property of the country club, walking down the driveway leading from the club's building to the street. For example, one of the police witnesses testified as follows:

> "THE COURT: . . . [W]as [defendant Nonni] on the property in question or was he on a public property?
>
> "THE WITNESS: He was on private property."

Shortly thereafter, the same witness testified as follows:

> "Q. The judge asked you, did you see Mr. Nonni on private property?
>
> "A. Yes.
>
> "Q. Did you see him on private property?
>
> "A. He was on private property, yes."

A few lines later, the witness testified that defendant Nonni "was on a private driveway" when the police first saw him. Thus, the record is clear that defendants, when first observed by the police, were not somewhere in the club's general "vicinity," as implied by the dissent, but on the private grounds of the country club itself.[1]

While the dissent objects to our describing the area in which defendants were apprehended as "secluded," our use of that word is not original. One of the police witnesses, upon cross examination at the hearing, described the area as "secluded":

"Q. And this is, it's fair to say, like a residential, like suburban, Country Club; am I correct?

"A. Yes.

"Q. As contrast, as opposed to the busyness of East Tremont or Westchester Avenue, correct?

"A. Right. It's a pretty secluded area of residential houses."[2]

In sum, defendants were first seen on private property where a burglary had just been reported, in a suburban area, with nobody else visible anywhere in the vicinity. This gave rise to a founded suspicion of criminality, justifying a level-two common-law inquiry under the *De Bour* analysis.

■ The police did not exceed the bounds of a common-law inquiry when they requested defendants to stop so that the police could "ask them a question," because such a direction does not constitute a seizure (*see e.g. People v Bora*, 83 NY2d 531, 532-535 [1994]; *People v Francois*, 61 AD3d 524, 525 [1st Dept 2009], *affd* 14 NY3d 732 [2010]). Instead of stopping, defendant Nonni immediately ran, and defendant Parker immediately made what officers described as a "hurried" and

---

**1.** Although the dissent asserts that the events in question took place "during normal business hours," the date of the arrest—January 21, 2008—was, in fact, Martin Luther King Day. Also, the dissent's reference to the country club as a "commercial establishment," while perhaps technically correct, is misleading.

**2.** Consistent with this testimony, the aerial photograph of the area received into evidence at the suppression hearing shows that the area is suburban in nature, with wide spaces between buildings. The suburban character of the area is also evident from the ground-level photographs of the scene submitted by defendant Nonni in a pro se post-hearing submission.

"evasive" departure.[3] Under all the circumstances, the record supports the conclusion that both defendants "actively fled from the police," rather than exercising their "right to be let alone" (*People v Moore*, 6 NY3d 496, 500-501 [2006]). Defendants' flight elevated the existing level of suspicion to reasonable suspicion, justifying pursuit and an investigative detention (*see People v Pines*, 99 NY2d 525, 526 [2002]; *People v Martinez*, 80 NY2d 444, 448 [1992]). Here, "[f]light, combined with other specific circumstances indicating that the suspect[s] . . . [might have been] engaged in criminal activity, . . . provide[d] the predicate necessary to justify pursuit" (*People v Holmes*, 81 NY2d 1056, 1058 [1993]).

Contrary to the dissent's assertion, the circumstances that prompted the initial police approach, from which defendants took flight (escalating the situation to one of reasonable suspicion warranting a level-three forcible stop and detention), went well beyond "equivocal circumstances that might justify a [level-one] police request for information" (*Holmes*, 81 NY2d at 1058). The cases on which the dissent relies, in which flight from police was held insufficient to give rise to reasonable suspicion, are inapposite because the circumstances prompting the initial police approach in those cases—unlike the circumstances that prompted the police approach here (i.e., defendants' presence by themselves on gated private property at which a burglary had just been reported)—did not give rise to a founded suspicion of criminality. In *Holmes*, the police had "merely observed [the defendant] . . . talking with a group of men on a New York City street" (*id.*). In *People v Reyes* (69 AD3d 523 [1st Dept 2010], *appeal dismissed* 15 NY3d 863 [2010]), when the police arrived at a public location in response to a report of " 'a dispute with a knife,' " two unidentified men "pointed at [the] defendant, who was walking away from them down the middle of the street, and said, 'That's him, that's him' " (*id.* at 524). As the *Reyes* decision notes, the two unidentified men did not make a specific accusation against the defendant, who "was not engaged in any suspicious activity" (*id.* at 526) when the officers first saw him. Finally, in *Matter of Manuel D.* (19 AD3d 128 [1st Dept 2005], *lv denied* 5 NY3d

---

**3.** We disagree with the apparent view of the dissent that, even if the pursuit of defendant Nonni was justifiable, the pursuit of defendant Parker was not. Although Parker did not break into a full-blown run, his evasive, "brisk" walking away from the officers, coupled with the headlong flight of Nonni, with whom he had been walking, gave rise to reasonable suspicion of Parker, and justified the police in pursuing and forcibly stopping him.

714 [2005]), the suspect "had no burglary tools and was merely standing on the street when the police approached" (*id.* at 130).

These circumstances justifying the officers' initial approach and subsequent pursuit of defendants, along with the facts that Nonni had a knife protruding from his bag, which cut the finger of an officer who assisted in subduing him, and that Parker had a sledgehammer visible in his unzipped bag, justified an immediate protective search of each defendant's bag and person (*see People v Batista*, 88 NY2d 650, 654 [1996]). The circumstances, including defendants' resistance to being detained, justified the use of handcuffs to secure them while the police completed their investigation into the reported burglary, and this did not transform the forcible stop into an arrest requiring probable cause (*see People v Foster*, 85 NY2d 1012 [1995]; *People v Allen*, 73 NY2d 378 [1989]). We have considered and rejected defendants' remaining suppression arguments.

■ Nonni's ineffective assistance of counsel claims are unreviewable on direct appeal because they involve matters of strategy not reflected in, or fully explained by, the record (*see People v Rivera*, 71 NY2d 705, 709 [1988]; *People v Love*, 57 NY2d 998 [1982]). Although trial counsel made remarks on the record that gave some explanation of his reasoning, the unexpanded record falls far short of permitting review. Accordingly, since Nonni has not made a CPL 440.10 motion, the merits of the ineffectiveness claims may not be addressed on appeal. In the alternative, to the extent the existing record permits review, we find that Nonni received effective assistance under the state and federal standards (*see People v Benevento*, 91 NY2d 708, 713-714 [1998]; *Strickland v Washington*, 466 US 668 [1984]). Nonni has not shown that any of counsel's alleged deficiencies fell below an objective standard of reasonableness (*see People v Hendricks*, 243 AD2d 396 [1st Dept 1997], *lv denied* 91 NY2d 941 [1998]), or that, viewed individually or collectively, they deprived Nonni of a fair trial or affected the outcome of the case.

■ Parker's challenge to the court's *Sandoval* ruling is unavailing. The ruling balanced the appropriate factors and was a proper exercise of discretion (*see People v Hayes*, 97 NY2d 203 [2002]; *People v Walker*, 83 NY2d 455, 458-459 [1994]). Parker's prior robbery convictions were probative of his credibility, and their age did not reduce their probative value, given that Parker had been incarcerated for most of the intervening

time period (*see People v Zillinger*, 179 AD2d 382 [1st Dept 1992], *lv denied* 79 NY2d 955 [1992]).

We have considered and rejected Nonni's excessive sentence claim, and his pro se arguments.

Accordingly, the judgments of the Supreme Court, Bronx County (John S. Moore, J., at suppression hearing; David Stadtmauer, J., at jury trial and sentencing), rendered November 4, 2010 as to defendant Parker and November 23, 2010 as to defendant Nonni, convicting each defendant of robbery in the second degree, and sentencing each defendant, as a persistent violent felony offender, to a term of 20 years to life, should be affirmed.

MANZANET-DANIELS, J. (dissenting). The officers in this case responded to a radio run of a burglary in progress at 3341 Country Club Road, a commercial establishment. Before stopping defendants, the only information the officers possessed was that a burglary had occurred in the vicinity. The radio run provided no information concerning the number or description of the perpetrators (*compare People v Michimani*, 115 AD3d 528 [1st Dept 2014], *lv denied* 23 NY3d 1036 [2014], 23 NY3d 1040 [2014]; *People v Cintron*, 304 AD2d 454 [1st Dept 2003], *lv denied* 100 NY2d 579 [2003]). It provided no details regarding the identity or reliability of the 911 caller. When the officers observed defendants, on a weekday morning at 9:30 a.m., there was no indication that they were engaged in illegal or suspicious activity. Given the extremely limited information possessed by the officers, they were justified, at most, in conducting a level one request for information. They did not have the requisite level of suspicion to order defendants to stop, or to pursue Nonni after he fled. I would accordingly grant defendants' respective suppression motions and order a new trial.

To evaluate whether police conduct was proper, we must consider whether the action was justified at its inception and whether the intrusion was reasonably related in scope to the circumstances that rendered its initiation permissible (*see People v De Bour*, 40 NY2d 210, 223 [1976]). The most minimal intrusion, level one, is a request for information "when there is some objective credible reason for that interference not necessarily indicative of criminality" (*id.*). Level two, a common-law inquiry, is "activated by a founded suspicion that criminal activity is afoot" (*id.*).

The majority's contention that the officers had a founded suspicion of criminality that permitted them to make a level-

two inquiry is untenable. The officers had no description of the alleged suspects and no information concerning the 911 caller. Defendants were observed to be in the vicinity of a country club, a commercial establishment in a residential area in the Bronx—hardly the "secluded" area described by the majority—during the daytime. Specifically, they were observed leaving the driveway of the club and walking down the street at an unhurried pace. The entry and exit of individuals from a commercial establishment during normal business hours cannot be deemed out of the ordinary, as the majority would appear to suggest. Given the limited information conveyed by the radio run, the officers had, at best, sufficient cause to conduct a level-one request for information (*see e.g. Matter of Manuel D.*, 19 AD3d 128, 129 [1st Dept 2005] [where the police had no description of the perpetrators and no information regarding the initial call to police, and the only information the officers possessed was the fact that a burglary was in progress at a certain location, the officers had no more than "an objective credible reason to request information"], *lv denied* 5 NY3d 714 [2005]).

Nonni's flight, under the circumstances, did not escalate the level of suspicion so as to justify the ensuing police pursuit. "Flight alone . . . , or even in conjunction with equivocal circumstances that might justify a police request for information, is insufficient to justify pursuit because an individual has a right 'to be let alone' and refuse to respond to police inquiry" (*People v Holmes*, 81 NY2d 1056, 1058 [1993] [internal citations omitted]; *People v Reyes*, 69 AD3d 523, 524 [1st Dept 2010] [where the officers arrived knowing only that a 911 call had been received about a "dispute with a knife," and lacked a description of the subject, and upon arriving at the scene were informed by bystanders "That's him," pointing to defendant, the pursuit of the suspects was not justified], *appeal dismissed* 15 NY3d 863 [2010]).

The officers were unjustified in pursuing Parker, who did not even flee but merely walked at a "hurried pace" across Country Club Road (*see People v Moore*, 6 NY3d 496, 500 [2006] [merely walking away from approaching police does not raise the level of suspicion]). The majority's conclusion that the police were justified in pursuing defendants is based on the faulty premise that the circumstances gave rise to a founded suspicion of criminality.

In my view, the fruits of the unlawful pursuits should be suppressed. Since the officer did not have authority to chase

Parker, the fact that the officer claimed to have later seen a sledgehammer in Parker's unzipped backpack does not furnish probable cause. The officer testified that he did not see the sledgehammer until *after* he caught up to Parker. He did not observe the sledgehammer or any other weapon prior to pursuing and detaining Parker. The observation of the sledgehammer after the pursuit cannot validate an encounter that was not justified at its inception (*see People v De Bour*, 40 NY2d at 215]).

Without the illegally obtained evidence, there is no proof beyond a reasonable doubt that defendants committed the crimes charged. I would grant defendants' respective motions to suppress, reverse their respective convictions, and order a new trial to be preceded by an independent source hearing.

ANDRIAS and SAXE, JJ., concur with FRIEDMAN, J.P.; RICHTER and MANZANET-DANIELS, JJ., dissent in an opinion by MANZANET-DANIELS, J.

Judgments, Supreme Court, Bronx County, rendered November 4, 2010 as to defendant Parker and November 23, 2010 as to defendant Nonni, affirmed.