People v Parker (2018 NY Slip Op 04776)

People v Parker

2018 NY Slip Op 04776 [32 NY3d 49]

June 28, 2018

Rivera, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 7, 2018

[*1]

The People of the State of New York, Respondent,
v
Lawrence Parker, Appellant.
The People of the State of New York, Respondent, 
 v Mark Nonni, Appellant.

Argued June 5, 2018; decided June 28, 2018

People v Nonni, 135 AD3d 52, reversed.

{**32 NY3d at 52} OPINION OF THE COURT

Rivera, J.

Defendants Lawrence Parker and Mark Nonni challenge their convictions for robbery in the second degree, based on the trial court's failure to provide counsel with notice of jury requests for information during deliberations and the denial of defendants' motions to suppress evidence recovered forcibly by the police. Defendants' claims that the court should have granted the suppression motions, to the extent preserved, are without merit. Pursuant to our well-established rules as set forth in this Court's seminal decision in People v O'Rama (78 NY2d 270 [1991]) and its progeny, however, we conclude that, because the record fails to establish that the trial court provided counsel with meaningful notice of the precise contents of two substantive jury notes in discharge of a core obligation under CPL 310.30, a mode of proceedings error occurred and a new trial must be ordered.
I. Suppression Hearing Evidence, Jury Note Record, and Decisions Below
[*2]Defendants were indicted and jointly tried for various crimes arising from the violent theft of several thousand dollars at a{**32 NY3d at 53} commercial establishment. The morning of the crime, defendants gained access to the building under the ruse that they were interested in renting the space for a private event. Once inside, defendants attacked and bound the complainant with duct tape before taking the money.
At defendants' suppression hearing, testimony from the arresting officers established that on January 21, 2008, at approximately 9:30 a.m., the police received a radio transmission about a burglary in progress. Within five minutes, three police vehicles arrived at the address provided by the 911 caller, which turned out to be a country club in a residential neighborhood. The only people the officers observed in the vicinity were defendants, who were walking together on the gated club's private driveway and heading towards the street. As the officers walked towards the driveway with their badges displayed, a uniformed officer ordered defendants to stop. This officer announced that they "were police officers and wanted to ask [defendants] a question." Defendants continued to walk away from the clubhouse, towards the street. The officer again called out, "please, stop, we want to ask you a question." Defendants then took off in opposite directions from one another and away from the police.
Three officers pursued defendant Nonni as he ran up the street. They caught up with and eventually subdued him on the ground. As one of the officers was handcuffing him, a knife sliced through defendant Nonni's backpack and cut the officer's finger. The officers then searched the bag and found two other knives and a roll of duct tape. They also retrieved from defendant Nonni's back-left pocket three bank envelopes, each marked with orange highlighter and each containing $1,000.[FN1]
While defendant Nonni ran, defendant Parker "briskly walked" in a "hurried pace" and "evasive" manner towards the other side of the street. Two officers followed, and one of them told defendant Parker to stop. As the officer got closer, he could see a sledgehammer in defendant Parker's unzipped backpack. The officer eventually grabbed defendant Parker from behind, handcuffed him, and retrieved a crowbar from his backpack and a small steak knife from the front pocket of his coat.
Based on the evidence at the hearing, the court denied defendants' respective motions to suppress. The court credited{**32 NY3d at 54} fully the police officers' testimony and found that under People v De Bour (40 NY2d 210 [1976]), the officers initially had a common-law right of inquiry. Defendants' immediate flight evinced more than a desire to be let alone, the court added, thus providing reasonable suspicion that both defendants were involved in a crime, which justified their pursuit, and the search and seizure.
On the morning of the second day of jury deliberations, the jury sent three substantive notes to the court within the span of an hour. The first note, sent at 11:16 a.m., requested definitions of several of the charged crimes as well as testimony related to where defendants were seen and caught; the second note, sent approximately 15 minutes later, requested testimony regarding fingerprint evidence; and the third note, sent 25 minutes later, requested testimony of the complainant and his wife.
The notes were marked into evidence as court exhibits. Outside of the jury's presence, the court stated on the record that it had received those three notes, which it would "be reading into the record after the jury [wa]s seated[,] and [that it was] going to respond to at least one of those notes" at that time. The court continued that it believed counsel agreed upon the sections of the testimony that would be read to the jury in response to the first note. As it turned out, there were open issues and so the court engaged in an on-the-record discussion with counsel as to the contents of the readback. At that time, the court did not read the other notes into the record nor mention whether counsel had seen or discussed those notes.
When the jury returned to the courtroom, the court stated on the record that it had received three notes and would read them back. The court then read the first note and proceeded to read back the requested testimony. At the conclusion of the readback, the court stated, "the additional testimony that you requested in the other two notes, we'll respond to that after lunch." The court also informed the jurors that they could deliberate during lunch.
[*3]
After that one-hour break, the court announced on the record that the jury had sent a note indicating it had reached a verdict. In response to the court's inquiry, defense counsel and the prosecutor confirmed that they had seen this last note. The court then accepted the verdict on the record in open court.
The Appellate Division affirmed the convictions with two Justices dissenting (People v Nonni, 135 AD3d 52 [1st Dept{**32 NY3d at 55}2015]). As relevant to the issues presented in this appeal, the majority concluded that the facts surrounding the police encounter, including defendants' flight from the police, justified the police action under De Bour. It also held that the knife protruding from defendant Nonni's backpack and the visible sledgehammer in defendant Parker's bag justified an immediate, protective search of their respective bags and persons (id. at 58). The Appellate Division did not address the O'Rama violation, which was not raised in that Court.
II. The Legality of the Police Stop and Search
Defendant Nonni argues that his mere presence on the commercial property did not provide a founded suspicion of criminal activity, and so the police action in pursuing and stopping him was unlawful at its inception. Defendant Nonni alternatively claims that, even if the initial stop was justified, the searches of his back pocket and the envelopes found therein were unconstitutional and the court should have suppressed the fruits of those searches. Defendant Parker does not contest the lower courts' conclusion that the officers had a common-law right to inquire when they first approached him on the private driveway. Instead, he argues that there is no support for the court's determination that the police had reasonable suspicion to stop and detain him, as he merely briskly walked, rather than ran, away from them.
As a threshold matter, whether the particular circumstances of defendants' cases gave rise to a founded or reasonable suspicion constitutes a mixed question of law and fact, which is beyond our review if there is record support for the courts' conclusion that the officers' actions were justified (see People v McRay, 51 NY2d 594, 601 [1980] [a mixed question of law and fact is presented where "facts are disputed, where credibility is at issue or where reasonable minds may differ as to the inference to be drawn from the established facts"]; NY Const, art VI; Arthur Karger, Powers of the New York Court of Appeals § 21:6 at 754-762 [3d ed rev 2005]). We conclude the record before us provides such support.
Police encounters with the public are evaluated under the four-tiered framework established in De Bour. At the first level, law enforcement may engage in minimally-intrusive questioning to request information "when there is some objective credible reason for that interference not necessarily indicative of criminality" (De Bour, 40 NY2d at 223). The second level, the{**32 NY3d at 56} common-law right of inquiry, permits officers "to gain explanatory information, . . . short of a forcible seizure" upon a "founded suspicion that criminal activity is afoot" (id.). The third level, "a forcible stop and detention," requires the "officer entertain[ ] a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor," and "[a] corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that [they are] in danger of physical injury by virtue of the detainee being armed" (id. [citation omitted]). "Finally[,] a police officer may arrest and take into custody a person when [the officer] has probable cause to believe that person has committed a crime, or offense in [the officer's] presence" (id. [citation omitted]).
Here, for both defendants, the police had a founded suspicion of criminal activity to support a common-law right of inquiry. The police received a radio transmission of a burglary in progress, and their encounter with defendants at the reported address occurred a mere five minutes later. The officers first saw defendants exiting private property, the scene of a suspected crime. The officers observed no other persons or cars in the secluded, residential area, and it was early in the morning on a federal holiday. In accordance with De Bour, those circumstances were sufficient to justify the officers asking defendants what they were doing and where they were going, and to continue inquiring when defendants did not respond after the officers identified themselves. Further, the officers' testimony, credited by the court, that defendant Nonni then "actively fled from the police," combined with the specific circumstances observed by the officers during their initial encounter with defendants, provides sufficient record support for the court's determination that there was reasonable suspicion of criminal activity to justify defendant Nonni's pursuit, forcible stop, and detainment (see People v Woods, 98 NY2d 627, 628 [2002] ["a defendant's flight in response to an approach by the police, combined with other specific circumstances indicating that the suspect may be engaged in criminal activity, may give rise to reasonable suspicion, the necessary predicate for police pursuit" (citation omitted)]; see also People v Simmons, 30 NY3d 957, 958 [2017]; People v Gayden, 28 NY3d 1035, 1037 [2016]; People v Esquilin, 91 NY2d 902 [1998]).
[*4]
Defendant Parker argues that, regardless of defendant Nonni's conduct, the police did not have reasonable suspicion to{**32 NY3d at 57} believe he was involved in a crime because instead of actively fleeing, he only briskly walked away from the police. According to the arresting officers' testimony, after defendant Parker saw defendant Nonni run and some police officers give chase, defendant Parker increased his pace, acted in an evasive manner, and crossed the street onto the front lawn of another property. The officer twice characterized Parker's movements as "running," albeit at a slow pace. While active avoidance of a confrontation between the police and an acquaintance does not itself give rise to reasonable suspicion, its combination with the specific, highly-suspicious circumstances observed by the police may give rise to heightened suspicion. Thus, record support exists for the court's conclusion that the officers had reasonable suspicion, and that the pursuit, stop, and detainment of defendant Parker, as well as the subsequent search of his bag, were permissible.
Contrary to defendant Parker's claim, the Appellate Division did not "improperly expand[ ] the longstanding rules" set forth in De Bour by considering defendant Nonni's flight from the police in assessing defendant Parker's actions. It was not "defendant's flight in response to an approach by the police" alone, but rather its combination "with other specific circumstances indicating that the suspect may be engaged in criminal activity," that made this police intrusion allowable (Woods, 98 NY2d at 628). On this mixed question of law and fact, there is record support for the courts' determination that the officers had reasonable suspicion to believe defendants were involved in a crime, justifying the police conduct (see McRay, 51 NY2d at 601).
Defendant Nonni's alternative claim that the searches of his internal coat pocket and the envelopes found inside were unconstitutional is unpreserved. A question of law is preserved for appeal when "a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same" (CPL 470.05 [2]). "[A] general objection—such as that contained in defendant's omnibus motion—is sufficient to preserve an issue for our review when the trial court 'expressly decided the question raised on appeal' " (People v Graham, 25 NY3d 994, 997 [2015], quoting CPL 470.05 [2]).
Defendant Nonni now argues that, even assuming the police stop was lawful, the internal searches were unconstitutional,{**32 NY3d at 58} but previously he only generally asserted that he should never have been stopped. For example, in his omnibus and post-hearing suppression motions, he asserted that "[a]ny property which may have been seized was done so in violation of the provisions of the state and federal constitutions in that it was preceded by an unlawful interference with [him], and was performed without consent and without a warrant." These broad challenges to his stop at its inception and the evidence found as the fruit of that stop were inadequate to preserve his current argument.
Nor did the trial court expressly decide this issue (see CPL 470.05 [2]). The grounds for the court's suppression determination are vague: the court simply concluded that, after defendant Nonni was handcuffed and the knife inside his backpack cut the officer, the seizure of the property was "justified and lawful." Inasmuch as defendant Nonni did not argue below that the internal searches were invalid and contested only the legality of the stop, the court's statement that the seizure was "justified and lawful" cannot be read, as defendant suggests, to have expressly decided the question. Therefore, defendant Nonni's argument is not reviewable under CPL 470.05 (2).[FN2]
III. The CPL 310.30 Violation
Defendants also claim that the trial court failed to provide notice to defense counsel of two substantive jury notes, and that under our law this constituted a mode of proceedings error requiring reversal of their convictions and a new trial. The People counter that defendants' claim is unpreserved, and, alternatively, that the record suggests counsel received notice and therefore a reconstruction hearing should be ordered.
CPL 310.30 requires that, in response to a jury request for additional information or instruction "with respect to any . . . matter pertinent to the jury's consideration of the case," the trial court "must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, . . . must give such requested information or instruction as the court deems proper." In People v Mack, we reaffirmed that CPL 310.30 "imposes two responsibilities on trial courts upon receipt of a substantive note from a deliberating jury: the court must provide counsel with meaningful notice{**32 NY3d at 59} of the content of the note, and the court must provide a meaningful response to the jury" (27 NY3d 534, 536 [2016], citing O'Rama, 78 NY2d at 276-277). "[M]eaningful notice 'means notice of the actual specific content of the jurors' request' " (id. at 538, quoting O'Rama, 78 NY2d at 277). The purpose of this requirement is to give counsel an opportunity to participate in the formation of a response to the jury's substantive [*5]inquiry (see O'Rama, 78 NY2d at 276-277). As we have repeatedly instructed, such "departures from the O'Rama procedures are not subject to preservation rules" (People v Walston, 23 NY3d 986, 989 [2014] [citations omitted]). Rather, "when the trial court fails to provide counsel with meaningful notice of a substantive jury note, a mode of proceedings error has occurred and reversal is required" (Mack, 27 NY3d at 538).
Here, on the second day of deliberations, the jury sent out three substantive notes. In the presence of the jury, the court acknowledged receipt of all three, and proceeded to read the first note and provide a response. There is no record, however, indicating that counsel was informed of the precise contents of the other two notes (see O'Rama, 78 NY2d at 276-277; People v Nealon, 26 NY3d 152 [2015]). The court thereby failed to fulfill its obligation under O'Rama. Contrary to the People's suggestion, counsel's awareness of the existence of the two additional notes did not effectuate the court's proper discharge of its statutory duty (see Walston, 23 NY3d at 990 [holding that the trial court does not "meet its core responsibilities with regard to the note" by establishing in the record that counsel was notified as to the existence of the note, as there must be "indication that the entire contents of the note were shared with counsel"]).
The People argue that the record suggests the court informed defense counsel of the existence of the notes and their contents, and thus counsel had sufficient opportunity to object. Yet, as the People concede, the court did not read into the record the contents of the notes at issue here.[FN3] Further, there is no hint in the record that the court provided counsel the contents of the notes; rather, an inference may be drawn to the contrary. Tellingly, while the court had read other notes, and had confirmed that counsel had read their contents on the record in the past, there is no such record regarding these two substantive notes.{**32 NY3d at 60} Indeed, the court's reference with respect to the first note—that it believed counsel had agreed to the readback it would provide in response—made no reference to the other two notes, suggesting that there was no discussion about those notes. Whether the record demonstrates a court has shown counsel prior jury notes as a matter of practice is irrelevant, since there must be specific, record proof that the court did so for each note.
Furthermore, we have explained that an insufficient record cannot be overcome with speculation about what might have occurred.[FN4] "The 'presumption of regularity' cannot salvage an O'Rama error of this nature" (People v Silva, 24 [*6]NY3d 294, 300 [2014] [citation omitted], quoting People v Velasquez, 1 NY3d 44, 48 [2003]). Instead, "[t]he record . . . must indicate compliance with adequate procedures under O'Rama because reviewing courts 'cannot assume' that the proper procedure was utilized when the record is devoid of information as to how jury notes were handled" (id., quoting Walston, 23 NY3d at 990). This is consistent with our prior holding in Walston that "[w]here a trial transcript does not show compliance with O'Rama's procedure as required by law, we cannot assume that the omission was remedied at an off-the-record conference" to which "the transcript does not refer" (23 NY3d at 990). As we have repeatedly explained, it is the court's responsibility to create a record (People v Morrison, 
32 NY3d 951, 952 [2018] ["We again decline 'to disavow our holding in Walston . . . that imposes an affirmative obligation on a trial court to create a record of compliance under CPL 310.30 and O'Rama' "], quoting People v Silva, 24 NY3d 294, 300 [2014]), and "[i]n the absence of record proof that the trial court complied with its{**32 NY3d at 61} core responsibilities under CPL 310.30, a mode of proceedings error occurred requiring reversal" (People v Tabb, 13 NY3d 852, 853 [2009]).[FN5]
In advocating that we remit to the trial court for a reconstruction hearing, the dissenters and the People ignore our case law.[FN6] Indeed, we rejected the same argument in [*7]Walston, and there is no basis to treat defendants' cases differently.[FN7] Moreover, {**32 NY3d at 62}ordering reconstruction hearings as a [*8]matter of course would imperil one of the foundations of O'Rama: the necessity that courts fulfill their core responsibility of providing counsel with notice of the precise contents of a jury note so that counsel may participate in designing a response. We will not weaken that foundation or disregard our precedent. Simply stated, where the record does not establish compliance with CPL 310.30, the sole remedy is reversal and a new trial.
Accordingly, in each case, the Appellate Division order should be reversed and a new trial ordered.

Chief Judge DiFiore (dissenting). The essential holding of People v O'Rama (78 NY2d 270 [1991]) is that the court's failure to disclose the actual content of a jury note prevents counsel from participating meaningfully in a critical stage of the trial. Such a failure is a deprivation of the opportunity to be heard and participate in formulating a response to the jury note and thus constitutes a mode of proceedings error. Where the record is silent as to whether defense counsel was ever provided the content of a jury note, or unequivocal that the court refused to provide notice as in O'Rama, our decision in O'Rama controls and a new trial is the remedy for the fundamental error in the proceedings. However, where, as here, the record supports the conclusion that the parties and the court discussed the content of the jury notes—which were marked as court exhibits—at an off-the-record proceeding prior to going on the record, a reconstruction hearing is the appropriate appellate remedy. Simply stated, a factual hearing is necessary{**32 NY3d at 63} to determine whether actual notice was provided in that proceeding, for if it was, there was no error and a new trial is unwarranted. To be sure, O'Rama's holding was centered on the failure of the court to perform a core responsibility in providing notice to counsel as mandated by CPL 310.30. It did not elevate a court's failure to make a complete record of the actual notice it provided counsel into a mode of proceedings error thereby excusing any need for preservation. As a result, I would reverse and remit the matter to the Appellate Division for its initial review to address the ambiguity in the [*9]record and determine whether a mode of proceedings error actually occurred (see People v Caban, 14 NY3d 369, 375 [2010]).
Facts matter, and the relevant facts are as follows. In its final instruction, the court instructed the jurors that should they desire to re-hear any portions of the testimony, they could request a readback. The court specifically advised the jury that, because readbacks are time-consuming, they should "pinpoint and describe exactly that part of the testimony that [they were] interested in hearing." During deliberations, the jury sent out a series of notes. The first jury note, marked as court exhibit 7, contained a request for police reports and arrest photos for both defendants. The court did not read the contents of the note into the record but confirmed, on the record with both counsel, that each had "seen the note requesting exhibits" and that the exhibits had been sent to the jury. At the end of that day, the court excused the jury and adjourned the matter until the next morning.
The transcript of the following day begins suddenly with the court and the parties back on the record and three additional jury notes (notes two, three and four) immediately marked as court exhibits. Jury note two (court exhibit 8), which is not at issue here, was timed at 11:16 a.m. That note requested several things: an exhibit, the definitions of certain charges and a readback of portions of police officer testimony. Note three (court exhibit 9), timed at 11:30 a.m., requested a readback of the testimony of the fingerprint expert concerning "the type of surfaces needed to get an accurate print." Note four (court exhibit 10), timed at 11:55 a.m., requested a readback of the testimony from the caretakers of the property concerning who was able to "rent the party room."
Outside the presence of the jury, the court stated for the record that three additional notes had been received and would "be read[ ] into the record after the jury [was] seated." The {**32 NY3d at 64}court went on to say that "we are going to respond to at least one of those notes now." In an obvious reference to a preceding off-the-record discussion, the court stated "I believe that counsel have agreed upon the sections of the testimony which can be read to the jury in response to note number [two]. Is that correct?" Despite the fact that jury note two had yet to be read verbatim in the record, the parties indicated their general agreement, and went on to discuss the disputed areas of requested testimony in detail, evidencing their knowledge of the actual content of jury note two.
After the parties agreed upon the readbacks for note two, the court brought the jury back into the courtroom. The court then stated "I have three notes from you and I just want to make sure that all of us remember what was in the notes so I'm going to review them, I'll read them back to you so that everyone will have a clear memory of what you've originally requested." The court then read note two into the record verbatim and told the jury "let's deal with that note first and we'll leave the other two for after lunch. One at a time." After providing the requested readbacks for note two, the court told the jury that "[t]he additional testimony that you requested in the other two notes, we'll respond to that after lunch." The court advised the jury that it could continue deliberating through the lunch recess and that they would "continue with the readback" after lunch.
When the parties came back on the record after the lunch recess, the court, in the intervening period, had received a fifth jury note indicating that the jury had reached a verdict. The court confirmed with counsel for the record that they had seen the note and that it had been marked as a court exhibit. The court then brought the jury back to the courtroom and accepted the verdict. There was no further discussion of the two outstanding notes requesting readbacks and there was no objection to the acceptance of the verdict.
Under CPL 310.30, the trial court has two distinct duties when handling substantive notes from a deliberating jury—first, it must provide meaningful notice to counsel of the actual, specific content of the note and second, it must provide a meaningful response to the jury's request (see CPL 310.30; O'Rama, 78 NY2d at 277). We have repeatedly held that a failure to satisfy the meaningful notice requirement is a mode of proceedings error. However, where counsel has been provided meaningful notice of the content of a note, the failure by the{**32 NY3d at 65} court to provide a meaningful response to the jury is error subject to our preservation requirements (see People v Mack, 27 NY3d 534, 536-537 [2016]). As we have previously held, "[i]n the O'Rama context . . . , lack of notice is the key determinant in classifying a particular procedure as a mode of proceedings error" because counsel cannot " 'participate effectively or adequately protect the defendant's rights' if counsel lacks notice 'of the actual specific content of the jurors' request' " (Mack, 27 NY3d 541-542, quoting O'Rama, 78 NY2d at 277). Moreover, in recognition of the fact that mode of proceedings errors "go to the essential validity of the process and [are] so fundamental that the entire trial is [*10]irreparably tainted," we have frequently observed "that not every departure from the O'Rama procedure or violation of CPL 310.30" will rise to the level of a mode of proceedings error (Mack, 27 NY3d at 541, 539 [internal quotation marks and citation omitted]). The point of O'Rama was "not to mandate adherence to a rigid set of procedures, but rather to delineate a set of guidelines calculated to maximize participation by counsel at a time when counsel's input is most meaningful, i.e., before the court gives its formal response" (O'Rama, 78 NY2d at 278).
Recently, we have strayed from O'Rama's essential holding by elevating the court's obligation of affirmatively making a record adequate for appellate review over its fundamental responsibility to provide meaningful notice of the content of a jury's communication (see People v Silva, 24 NY3d 294 [2014]; People v Walston, 23 NY3d 986 [2014]; People v Tabb, 13 NY3d 852 [2009]). I would not extend the holdings in those cases to the facts of the present cases, as to do so would foster an unwarranted and unnecessary per se error rule inconsistent with the core holding of O'Rama.[FN1] These cases have led this {**32 NY3d at 66}Court today to a rule which requires the reversal of a conviction—purportedly for an error that impacts the essential validity of the trial—based on the technical defect of failing to make an adequate record (CPL 470.05 [1]). The rule operates without regard to the specific facts of whether counsel actually received meaningful notice of the content of the jury note. Where, as here, the record is ambiguous as to whether the actual content of the jury notes was given to counsel—in that the record demonstrates there was an off-the-record discussion of the jury notes—we have no reason to presume that a fundamental flaw in the trial process occurred.
Here, the record reveals that it was the trial court's procedure to first give notice of the jury notes to counsel at an off-the-record conference.[FN2] When responding to the note in the jury's presence, the trial court would then either [*11]read the note into the record verbatim or confirm with the attorneys on the record that they had seen the note. The record reflects that notes two, three and four were received by the court over a 41 minute interval and that all three notes were marked as court exhibits. In addition, the record demonstrates that the attorneys were aware of the content of note two, that there was an off-the-record discussion as to the proper response to that note before the parties went on the record, and that there was an on-the-record discussion as to when the court would respond to notes three and four. Given the narrow scope and relative insignificance of the requested readbacks in notes three and four, it is unsurprising that there was no discussion on the record as to the content of the court's intended response. Indeed, certain readbacks can be perfunctory in nature. Based on the above, there is a reasonable view of the record that the trial court did show notes three and four to the attorneys when{**32 NY3d at 67} they saw note two.[FN3] This ambiguity demands additional exploration to ascertain what the facts are specifically, and whether counsel received the requisite notice, for if counsel did receive the required notice, then no mode of proceedings error occurred. Parenthetically, our practical solution in Mack, dealing with an inadequate record as to whether the first-prong notice requirement was satisfied before a response was given, cannot be invoked here as the jury reached a verdict and effectively rescinded its requests for readbacks in the two jury notes at issue. Consequently, the Court did not employ its patterned procedure of reading the notes verbatim into the record before giving the jury its response. Seemingly, defendants have reaped a benefit from the court's decision to provide its responses in seriatim, but it is not a benefit necessarily consistent with any error in the case.
We have recognized in similar contexts that, where there is a significant ambiguity in the record, a reconstruction hearing is appropriate as we are not inclined to reverse trial verdicts on technical errors (see e.g. People v Velasquez, 1 NY3d 44, 49 [2003]). Thus, in People v Walker (18 NY3d 839 [2011]), we held that a reconstruction hearing was necessary to determine whether the defendant's right to be present for his Sandoval hearing was violated (see also People v Michalek, 82 NY2d 906, 907 [1994]; People v Monclavo, 87 NY2d 1029, 1031 [1996]). In addition, the Appellate Division has ordered reconstruction hearings to address whether an O'Rama error occurred (see People v Mitchell, 129 AD3d 404 [1st Dept 2015]; People v Williams, 113 AD3d 1116 [4th Dept 2014]; People v Kahley, 105 AD3d 1322 [4th Dept 2013]; People v Cruz, 42 AD3d 901 [4th Dept 2007]). Indeed, in People v Cruz, we heard an appeal on an O'Rama issue after a reconstruction hearing had been held—a procedure that the presiding Chief Judge characterized as a "very useful exercise" (14 NY3d 814, 818 [2010, Lippman, Ch. J., concurring]).
{**32 NY3d at 68}In invoking the Walston automatic reversal rule because of the incomplete nature of the appellate record, the majority fails to appreciate the significant fact that defendants' O'Rama argument was raised for the first time in this [*12]Court. Since the Appellate Division has not had the opportunity to review this issue, which may turn on a factual determination suited to that Court's review power, the proper remedy is to remit the matter to that Court for further proceedings (see Caban, 14 NY3d at 375).[FN4] Upon remittal, the Appellate Division would have the ability to order a reconstruction hearing to determine, in the first instance, whether defense counsel received meaningful notice and, if not, whether the jury implicitly withdrew the notes at issue when it reached its verdict.
This case is distinguishable from our ruling in People v Silva, where we held that O'Rama errors had occurred where there was no response to certain jury notes before the jury delivered its verdict. In both Silva and its companion case, Hansen, we observed that the record was silent as to whether the court or the parties were aware of the notes before the verdict was taken (see 24 NY3d at 300). Here, by contrast, all parties were well aware of the existence of the two notes and that the jury in both notes was requesting readbacks of testimony. Significantly, the court twice advised the jury that a response to those notes would be provided after the lunch break but that they could continue to deliberate in the meantime. Under the circumstances presented in this appeal, there is a reasonable argument to be made that the jury rescinded those readback requests when it delivered its verdict. There is likewise a reasonable argument that, under these circumstances, defense counsel, who was aware that the notes were outstanding, was required to object before the court took the verdict (see e.g. United States v Young, 140 F3d 453, 456-457 [2d Cir 1998]). In any event, where, as here, the jury knew that the court was going to provide the requested testimony, defendants were not seriously prejudiced by the lack of response to the notes at issue, which contained only narrow requests for readbacks (see{**32 NY3d at 69} People v Agosto, 73 NY2d 963, 966 [1989]; People v Lourido, 70 NY2d 428, 435 [1987]).[FN5]
In sum, I would not hold that a mode of proceedings error occurred on the ambiguous records before us. Rather, these cases should be remitted to the Appellate Division for its consideration of the issue in the first instance.

Dissenting opinion by Garcia, J. 
Garcia, J. (dissenting). I dissent for the reasons stated in my dissenting opinion in People v Morrison[*13] (32 NY3d 
951 [2018] [decided today]).
Judges Stein, Fahey and Wilson concur; Chief Judge DiFiore dissents in an opinion, in which Judges Garcia and Feinman concur in a separate dissenting opinion by Judge Garcia.
In each case: Order reversed and a new trial ordered.

Footnotes

Footnote 1:At trial, the complainant testified that the burglars took three envelopes that he had marked with a red pen, and that each envelope contained $1,000.

Footnote 2:Defendants' remaining suppression arguments are unavailing on this appeal.

Footnote 3:When such circumstances arise, nothing prevents the prosecutor from alerting the court to the need to place the contents of the notes on the record.

Footnote 4:The Chief Judge's dissent describes the record as "ambiguous as to whether the actual content of the jury notes was given to counsel," but continues that "the record demonstrates there was an off-the-record discussion of the jury notes" (DiFiore, Ch. J., dissenting op at 
66). There exists no record evidence that the notes were shown to counsel, only that counsel was made aware of the notes, and we have been clear that awareness of a note's existence is insufficient. We have also rejected speculation as a permissible method of filling in gaps in a record. The dissenters merely retread old ground and make arguments we have previously rejected (id. at 
67 Garcia, J., dissenting op at 69, citing People v Morrison, 32 NY3d 951 [2018, Garcia, J., dissenting]). That the dissenters would have preferred a different outcome in our prior cases is no basis to ignore our precedent. "[B]oth the legitimacy and the ability of the judiciary to function dictate that legal issues that have been addressed by a jurisdiction should not be revisited every time they arise" (People v Taylor, 9 NY3d 129, 148 [2007]).

Footnote 5:The fact that the jury sent a note stating it had reached a verdict does not affect our analysis. The court failed to meet its first core responsibility with respect to the two notes by not providing the required notice, and the subsequent verdict does not negate that error. While a court's "violation of the meaningful response requirement does not constitute a mode of proceedings error" if "counsel has meaningful notice of the content of a jury note" (Mack, 27 NY3d at 537), our precedent makes clear that the failure to provide notice "violates the fundamental tenets of CPL 310.30" and requires a new trial (Silva, 24 NY3d at 299). Moreover, the Court has previously rejected the line of argument that "[c]ases in which the jury sends a note and then returns a verdict before the court has answered . . . require reversal only where the defendant is prejudiced by the failure to respond" (Silva, 24 NY3d at 301 [Smith, J., dissenting]).

Footnote 6:The Chief Judge also argues in dissent that reconstruction hearings are permissible in similar contexts to O'Rama hearings, and therefore should be permissible here (DiFiore, Ch. J., dissenting op at 
67). Yet the cases on which that dissent relies are distinguishable: they address a defendant's right to be present at a Sandoval hearing and a robing room conference, rights that may be waived. There is no mechanism for waiving O'Rama notice, as one cannot waive an opportunity about which one was never informed (O'Rama, 78 NY2d at 280 n 3; see also People v Fenton, 105 AD3d 1057, 1058 [2d Dept 2013] [reconstruction hearings was "not an appropriate remedy" for errors under O'Rama]). In her dissent, the Chief Judge also cites former Chief Judge Lippman's concurrence in People v Cruz (DiFiore, Ch. J., dissenting op at 
67), but that concurrence lends her position no support either. There, the former Chief Judge stated that the Appellate Division had "relied on pre-O'Rama decisions," and ultimately held that reversal and a new trial were warranted because O'Rama's requirements had not been met (14 NY3d 814, 818-819 [2010, Lippman, Ch. J., concurring]). Neither does People v Caban compel us to remit to the Appellate Division, as the Chief Judge's dissent suggests (DiFiore, Ch. J., dissenting op at 
68, citing 14 NY3d 369, 375 [2010]). In that single case, we remitted to the Appellate Division, but Caban presented unique circumstances. Tabb was decided after the Appellate Division decision in Caban but before that case reached this Court, providing us reason to remit to the Appellate Division to address the defendant's case in accordance with our case law. Moreover, Caban predates our recent decisions, which require that to avoid a mode of proceedings error the record must establish the court followed the proper notice procedures.

Footnote 7:There exists no empirical evidence supporting Judge Garcia's suggestion of a widespread failure of our courts to comply with CPL 310.30 and O'Rama (see Garcia, J., dissenting op at 
69, citing People v Morrison, 32 NY3d 951 [2018, Garcia, J., dissenting]; see also DiFiore, Ch. J., dissenting op at 
66 n 2). Rather, the evidence suggests the opposite: it seems unlikely that O'Rama has undermined our criminal justice system as Judge Garcia's dissent implies. Only a small number of criminal cases go to trial—in 2017, only 1,701 of the felony indictments and SCIs were disposed of through trials, while 40,449 were disposed of through other means, mostly plea deals (New York State Division of Criminal Justice Services, Criminal Justice Case Processing Arrest through Disposition New York State January-December 2017, http://www.criminaljustice.ny.gov/crimnet/ojsa/dar/DAR-4Q-2017-NewYorkState.pdf [accessed June 23, 2018])—and in those cases that advance to an appeal, reversals are relatively rare. In the First Department, for example, affirmances have been between 70% and 73%, while reversals and modifications have been between four and seven and four and five percent, respectively (Legal Research Group, Monitoring the Appellate Trends: A Closer Look at the New York State Unified Court System Annual Reports, http://www.cplrg.com/page_blog_single.cfm?bid=147 [accessed June 23, 2018]). Moreover, this Court has seen very few cases evincing O'Rama errors in the almost 30 years since O'Rama was decided, suggesting that such cases are aberrations. The cases Judge Garcia cites are representative of nothing other than the proper application of the law, and if the People want to avoid reversals on O'Rama grounds they can bring errors to trial courts' attention.

Footnote 1:Significantly, in O'Rama, we stated that we were following the "meaningful notice" procedure outlined in United States v Ronder (639 F2d 931, 934-935 [2d Cir 1981]). Federal courts have generally treated this type of error as a violation of a defendant's right to be present—including the right to have counsel be heard—and have applied a substantial compliance standard as well as harmless error analysis where the communication at issue did not prejudice the defendant (see United States v Martinez, 850 F3d 1097, 1102, 1109 [9th Cir 2017]; United States v Collins, 665 F3d 454, 460-461 [2d Cir 2012]; United States v Mejia, 356 F3d 470, 474-476 [2d Cir 2004]; compare Rogers v United States, 422 US 35, 38-40 [1975] [recognizing that harmless error was applicable to some violations of the right to be present, but holding that judge's unilateral response to jury note as to his willingness to accept a guilty verdict with a recommendation of "extreme mercy" was so potentially prejudicial as to not require preservation in either the trial court or the Court of Appeals]).

Footnote 2:Indeed, there can be no dispute that the extant transcript omits a series of events that occurred that morning—including convening the jury and sending them out to resume deliberations, the court notifying counsel that the jury notes were received, and the initial discussion among the parties of the testimony that would be provided in the readback after the notes were received. The application of the majority's per se reversal rule on this record ignores the realities commonly attending the trial process and, ironically, finds error in what may only be the court's failure to record the absence of error.

Footnote 3:It should be noted that counsel for appellants have not, despite a strong incentive to do so, represented to the Court that trial counsel did not receive notice of the contents of notes three and four. Rather, the only argument advanced in our appeal relates to whether the record evidences such notice. This argument is in keeping with the majority's per se rule, which allows counsel who receives meaningful notice of the content of a jury note "to sit idly by while error is committed" and then argue that the record does not reflect such error (see People v Patterson, 39 NY2d 288, 295 [1976], affd 432 US 197 [1977]; Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.1).

Footnote 4:The majority concedes that certain of this Court's recent cases have exalted the requirement of making an appellate record over the trial court's core obligation to provide meaningful notice as set forth in O'Rama (majority op at 
61 n 6). We disagree that this exaltation diminished the precedential value of Caban, where the pivotal concern was that the intermediate appellate court was deprived of the opportunity to review an issue that has a significant factual component and was not raised before it.

Footnote 5:Although the Court rejected a similar argument in Silva (see 24 NY3d at 300), as noted above, these cases are distinguishable based on the knowledge of the existence of the notes and the intended response.