People v Bilal (2019 NY Slip Op 01673)





People v Bilal


2019 NY Slip Op 01673


Decided on March 7, 2019


Appellate Division, First Department


Renwick, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 7, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Rosalyn H. Richter
Sallie Manzanet-Daniels
Peter Tom
Ellen Gesmer, JJ.


6358/08 7052 

[*1]The People of the State of New York, Respondent,
v
Rashid Bilal, Defendant-Appellant.



Defendant appeals from an amended judgment of the Supreme Court, New York County (Arlene D. Goldberg, J.), rendered January 13, 2017, convicting him, after a jury trial, of criminal possession of a weapon in the second degree, and imposing sentence.




Robert S. Dean, Center for Appellate Litigation, New York (Matthew Bova of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Philip Morrow and David M. Cohn of counsel), for respondent.



RENWICK, J.P.


Defendant was convicted of criminal possession of a weapon in the second degree, with regard to a gun he discarded during a police pursuit. In this appeal, we must decide whether the circumstances existing when the police approached defendant, combined with defendant's flight, provided the police with the required reasonable suspicion to justify a police pursuit or whether defendant had the right to be let alone. For the reasons explained herein and upon proper application of the De Bour principles (People v De Bour, 40 NY2d 210, 223 [1976]), the police officers' action in pursuing defendant was inconsistent with our Constitution and our laws which seek to protect our citizens on their streets and in their public places from being seized by the police except where individualized suspicion of wrongdoing exists.
Detective Richard Pengel testified at the suppression hearing that on December 27, 2008, he, along with three other officers, were patrolling, in plainclothes, in an unmarked car, on 145th Street and Seventh Avenue. At approximately 9:20 P.M., they received a radio report of shots fired at 150th Street and Macombs Place. The report indicated that the incident had just happened, and a second report indicated that a man had been shot. The perpetrator was described [*2]a black man wearing a black jacket.
When the call was received, the officers were five blocks south and one avenue away from the location where the shots were fired. The officers proceeded to an area a few blocks away from the location the radio report indicated; they went to the Dunbar Houses, located at 149th Street and Seventh Avenue. The officers knew that it was possible to cut through the Dunbar Houses to get to the subway station where a perpetrator could escape.
Several minutes later, the officers arrived at 149th Street and Seventh Avenue and saw two black men walking out of one of the entrances to the Dunbar Houses. One of the men was wearing a black bubble jacket, and the other man, defendant, who was taller than the man in the black jacket, wore a gray jacket. The officers decided to stop the two men because the man with defendant matched the description of the shooter and because the officers believed the men were coming from the area where the shots had been fired. They also surmised that the men could have witnessed the crime or could have been victims.
Pengel pulled his car up behind the men and stopped. His lieutenant got out of the car and said, "Hey, Buddy, ... come here." While the man in the black jacket stopped, defendant began running. The other officers got out of the car, and while the lieutenant stayed with defendant's companion, Pengel drove the car south to cut off defendant and turned on his siren. Defendant ran in front of Pengel's car at one point, then underneath scaffolding at a construction site, where he threw something black over a fence. Defendant then let himself down and continued to run on 149th Street toward Eighth Avenue. Pengel continued to chase defendant in his car and repeatedly told him to stop. He finally stopped on 149th Street and was apprehended. Pengel went to the construction site and saw a gun lying on the ground. It was thereafter recovered by other officers.
At the conclusion of the suppression hearing, Supreme Court found that the police conduct was reasonably responsive to the situation presented. Further, even if the police pursuit was not justified, Supreme Court found that the recovery of the gun was proper because it had been abandoned by defendant. We now reverse on both grounds.
A police officer is limited to the degree of intrusion permitted by the circumstances of the case and may not exceed that level of intrusion absent a clear change in circumstances that would permit a greater intrusion (see People v Hollman, 79 NY2d 181, 185, 191-192 [1992]). In addition, not only can a citizen refuse to answer an officer's question, a citizen has the right to walk away. Likewise, should a citizen run from an officer, such flight, where there is no indication of criminal activity, is an insufficient basis for pursuit by an officer (People v Holmes, 81 NY2d 1056, 1057-1058 [1993]). "Flight alone, even if accompanied by equivocal circumstances that would justify a police request for information, does not establish reasonable suspicion of criminality and is insufficient to justify pursuit, although it may give rise to reasonable suspicion if combined with other specific circumstances indicating the suspect's possible engagement in criminal activity" (People v Reyes, 69 AD3d 523, 525-526 [1st Dept 2010], appeal dismissed 15 NY3d 863 [2010]; see People v Pines, 99 NY2d 525, 527 [2002]; People v Holmes, 81 NY2d at 1058). "Police pursuit of an individual 'significantly impede[s]' the person's freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being, or is about to be committed" (Holmes, 81 NY2d at 1058, quoting People v Martinez, 80 NY2d 444, 447 [1992]).
Applying these principles, we find that defendant's motion to suppress should have been granted. While the police may have had an objective credible reason to approach defendant and to request information  based on the information the officers received from the radio report and their observations of defendant and his companion  those circumstances, taken together with defendant's flight, could not justify the significantly greater intrusion of police pursuit.
Indeed, the radio report simply indicated a sole perpetrator with a vague description  black man in a black jacket. There was nothing at all about defendant that matched any aspect of the suspect in the radio report, except that he was black. Nor was defendant wearing a black jacket. He was wearing a gray jacket and was with a second individual, several minutes after the [*3]radio report of shots fired. The men did not appear to be fleeing the scene, but rather, were exiting an apartment complex. Thus, unlike the cases relied on by the People, defendant did not match any description, general or otherwise (see e.g. People v Montilla, 268 AD2d 270 [1st Dept 2000], appeal dismissed 95 NY2d 830 [2000]). Further, there was insufficient evidence to support the conclusion that defendant knew Pengel and his colleagues were police officers (see People v Riddick, 70 AD3d 1421, 1423 [4th Dept 2010], lv denied 14 NY3d 844 [2010]).
That defendant was with someone who matched an extremely vague, generic description of the suspect, which contained no information about the suspect's height or weight, was not sufficiently indicative of criminal activity on defendant's part (see People v Beckett 88 AD3d 898, 899-900 [2nd Dept 2011]; Matter of Rubin M., 271 AD2d 291 [1st Dept 2000] [finding no reasonable suspicion where "the police approached and stopped [defendant] only because he matched the generic description of the perpetrator[,] . . . a description which could just as easily have applied to countless Bronx and Manhattan residents]). Given that this incident took place in a densely populated area of Harlem in the early evening hours, many people could have fit the vague description of a black man in a black jacket.[FN1]
Nor was the fact that police observed defendant and his companion walking out of one of the entrances to an area (Dunbar Houses) that the police considered a possible escape route sufficiently indicative of criminal activity on defendant's part. The police had no information concerning the shooter's flight path from the reported shots-fired location. Instead, the police acted on a hunch and drove over to the apartment complex two blocks away. Since defendant was not leaving a location specified by the radio call, but was simply walking out of the apartment complex, the police had no reason to suspect that he was the gunman, particularly because the area was not described as desolate (compare Becket, 88 AD3d at 899-900 with People v Parker, 32 NY3d 49 [2018] [reasonable suspicion of criminal activity to justify defendants' pursuit was supported by "specific circumstances observed by the officers during their initial encounter with defendants," namely seeing "defendants exiting private property, the scene of a suspected crime, combined with the defendants actively fleeing from the police"]; People v Lovett, 189 AD2d 696, 696 [1st Dept 1993] [police, who knew "the apparent perpetrator's flight path" had reasonable suspicion to chase defendant, the only person in the vicinity of the shooting]).
If we were to endorse a police pursuit under the grossly equivocal circumstances here  where the extremely vague, generic description of a "black [man in] a black jacket" is used to justify pursuit of the companion of someone matching that description  this Court would be ignoring an extraordinary interference with a citizen's right to be left alone. "That is not, nor should it be, the law" (People v Holmes, 81 NY2d at 1058. While flight plus other specific circumstances may indicate that the suspect has engaged in criminal activity, "flight alone or in conjunction with equivocal circumstances that might permit a request for information is insufficient to justify pursuit" (Beckett, 88 AD3d at 899). Since there were no specific circumstances indicating that defendant had engaged in criminal activity, his flight did not justify the officer's pursuit (id.).
Each of my dissenting colleagues offers a different reason for voting to affirm the denial of defendant's motion to suppress and, accordingly, to affirm the conviction. Justice Tom's dissent primarily argues for the validity of the police pursuit. His dissent cannot and does not dispute that if a police officer initially does not have a founded suspicion that a particular person has engaged in criminal activity, the person's flight will not provide the reasonable suspicion necessary for a police pursuit (see People v Martinez, 80 NY2d 444, 448 [1992]).
However, in finding individualized founded suspicion against defendant, Justice Tom's [*4]dissent misinterprets the record. Contrary to the dissent's conclusion, the police officers did not testify at the suppression hearing that, upon their initial encounter with defendant and the other black man, they believed that either of the two black men could have been the shooter. Instead, the officers testified that "it was possible one of them could be the shooter." This reference by the officers obviously related to the man who matched the vague description of the shooter, as defendant was not wearing a black jacket, the only description of the shooter provided by the anonymous tipster. The dissent's suggestion that the person who did not match the description could have been an accomplice is pure speculation because the radio run clearly only referred to one person and did not indicate that any more than one assailant was involved in the shooting. Even as to the black man who matched the very vague description of the shooter, the police officers plainly found the description too equivocal as indicated by their admission that the men could have been witnesses to the crime or could have been victims.
Therefore, contrary to Justice Tom's dissent, the officers' inquiry did not begin with a founded suspicion of criminality as to defendant, but began with the lesser standard of objective credible reason. At this primary level of inquiry, the police had at most a basis to approach defendant and the other man for information. Defendant, however, had the right to refuse to cooperate and walk or even run away, as he did. But, since the officers had no reason to suspect that he was the shooter, they had no basis to pursue or detain him. Under the circumstances, the officer's decision to pursue defendant could have been based upon nothing more than the fact that defendant chose to avoid them.
We are unwilling to overlook the very significant facts that the police officers had only a vague description of the shooter and defendant did not even match this vague description, simply because the police encounter with the two black men took place some minutes after the reported shooting and several blocks away from the scene. Unlike Justice Tom's dissent, we will not turn a blind eye to the character of this neighborhood or the normal evening hour at which the encounter occurred. That defendant and another black man were walking several city blocks from the crime scene, in the Harlem section of Manhattan, should have been unremarkable.
Ultimately, the principles of De Bour (40 NY2d at 223) and its progeny do not stand for the broad proposition apparently embraced by Justice Tom's dissent, that when police officers are confronted with the "urgent situation involving the firing of a gun and possible shooting victim," the police officers may pursue a person, whom the officers had no reason to suspect was the shooter, simply because the police encounter happened "mere minutes after the reported shooting and in close spatial proximity to the shooting." Of course, "[a] police officer is entitled, and in fact is duty bound, to take action" in a proper manner in such a situation (People v Benjamin, 51 NY2d 267, 270 [1980]). We must not forget that De Bour and its progeny stand, in its general and indeed specific sense, for the principle that police action must be justified from its inception, and at any subsequent juncture, by a sufficient factual predicate even when the police are confronted with an "urgent situation of the firing of a gun and a possible shooting victim" (People v Leung, 68 NY2d 734, 736 [1986]; People v Howard, 50 NY2d 583, 592 [1980], cert denied 449 US 1023 [1980]).
Nor are we persuaded by the cases relied on by Justice Tom's dissent. The dissent primarily relies upon Matter of Robert R. (231 AD2d 406 [1st Dept 1996]), in which police officers initially received a radio transmission of "shots fired" at a particular location. At the scene, the officers received further information from a civilian confirming that shots had been fired and providing a description and the direction of the flight of a male who had fled with other people; the arresting officers then encountered a group of males, 15 minutes later, four or five blocks away, one of whom, not the defendant, matched the description provided.
This case, in contrast, involves a scant, vague description of the shooter by an anonymous informant, with no civilian confirmation at the scene and no "direction of flight." Under these circumstances, we cannot ignore the principle that the police cannot seize or pursue a defendant based upon an anonymous tip unless the surrounding circumstances or the nature of the information given in the tip itself provide individualized founded suspicion that the person has [*5]engaged in criminal activity (Holmes, 81 NY2d at 1056). In the instant case, the anonymous tip itself offered nothing more than an extremely vague description of the shooter, which did not match defendant. The unknown informant did not say that he or she witnessed the shooting. The only "surrounding circumstance" mentioned by the police as being indicative of defendant's criminality was that one of the two black men, present in a predominantly black neighborhood, wore a black jacket. Thus, defendant's attempt to evade the police by running from the scene was insufficient to validate the pursuit on the basis of the vague tip in this case.
Nor does the Court of Appeals' recent decision in Parker (32 NY3d at 49) support Justice Tom's position. In Parker, the police received a radio transmission of a burglary in progress, and their encounter with defendants at the reported address occurred a mere five minutes later (id. at 56). The officers first saw defendants exiting a gated country club in a secluded, residential neighborhood, the actual scene of the suspected crime. The officers observed no other persons or cars in the secluded, residential area, and it was early in the morning on a federal holiday (id.). Thus, in Parker, the police made a proper common-law inquiry based upon an anonymous tip and the circumstances at the scene.
Accordingly, Justice Tom's conclusion that "[h]ere, officers had more information about the perpetrator than the police in Parker" is unfounded. In this case, defendant and the other black male were found walking several city blocks from the crime scene, in the Harlem section of Manhattan. It would not have been unusual to find two black men walking in a predominantly African-American neighborhood.
We are also unpersuaded by Justice Richter's dissent arguing that even if the initial pursuit was unlawful, defendant's act of throwing the gun was a calculated act of voluntary abandonment [FN2]. There is a presumption against the waiver of constitutional rights (Howard, 50 NY2d at 593), and therefore courts "should conclude that abandonment has occurred in only the clearest of cases" (People v Torres, 115 AD2d 95, 99 [1st Dept 1986]; see also People v Pirillo, 78 AD3d 1424, 1425-1426 [3rd Dept 2010]). Moreover, the People bear the burden of proof on this issue (Howard, supra; People v Rojas, 163 AD2d 1, 2 [1st Dept 1990]).
Within the context of an illegally initiated police chase, only when the defendant's act is independent and unrelated to the illegal police conduct is the abandonment voluntary (see People v Boodle, 47 NY2d 398, 403-404 [1979], cert denied 444 US 969 [1979]). If the defendant's act is spontaneous, and provoked by the illegality, the abandonment cannot be intentional or voluntary (id.). A spontaneous response is instinctual, rather than planned, and it is precipitated by the coercive nature of the illegality (Howard, 50 NY2d at 593; see e.g. People v Holmes, 181 AD2d 27, 32 [1st Dept 1992], affd, 81 NY2d 1056 [1993] [finding that the bag and its contents must be suppressed where defendant dropped the bag during officers' unlawful and "continuous hot pursuit"]). "[The] coercion negates the ability to make a thoughtful decision involving the conscious assumption of a risk" (Torres, 115 AD2d at 99). Conversely, a calculated and independent act is one that is the product of thought and reflection (id.). It is undertaken only after a defendant has had an opportunity to consider how to proceed, by weighing the risks involved in discarding the incriminating evidence (id.). Thus, the spontaneous act is an instinctive reaction to a confrontation with the police; the independent act is a reflective, intellectual formulation of strategy.
In this case, it is undisputed that immediately after the police command, defendant ran away, and two police officers chased him; one officer followed him on foot, while the other pursued him in a police vehicle while hitting the horn and using the siren. Defendant continued to run towards a construction site. Then, defendant ran under some scaffolding, climbed up a wooden fence, and threw a black object he had in his hand down into the construction site. Thus, [*6]it appears that the chase was a fast-paced, continuous event that lasted mere minutes. Under such circumstances, it can be fairly inferred that defendant's actions in the heat of the chase "were precipitated by an instinctive drive to escape his pursuers rather than a reflective, intellectual formulation of strategies" (Torres, 115 AD2d at 99). Contrary to the dissent's assertion, defendant's action of "running under a scaffold, climbing a fence" and "throwing a gun over the fence" is nothing more than an attempt to escape an unlawful pursuit by the police and does not indicate that defendant had ample time to contemplate his options and make a conscious choice to dispose of evidence.
Courts have consistently held that when, like here, the police are in "hot pursuit" of a defendant following an illegal attempt to seize the defendant, the defendant's act of discarding property during the continuous chase is not an abandonment. In People v Howard (50 NY2d at 593), the police had no reasonable suspicion of criminal activity by the defendant; after he refused to answer their questions and fled, they unlawfully pursued him. After being chased into the basement of a building, the defendant threw a package he was holding to the ground; the package contained a gun (id. at 587). The Court of Appeals found that the defendant's actions were precipitated by a desire to elude capture; as a result, the defendant did not intentionally and voluntarily relinquish his expectation of privacy in the package (id. at 593).
Similarly, in People v Torres (115 AD2d at 99), this Court found that the police acted improperly in grabbing the defendant and pursuing him when he ran away. During an unlawful hot pursuit, the defendant ran into an alley and threw a gun over a fence (id. at 95). This Court concluded: "It is only realistic to assume that defendant's actions were precipitated by an instinctive drive to escape his pursuers rather than a reflective, intellectual formulation of strategies" (id. at 99). Thus, the weapon was suppressed because it was not abandoned.
Finally, in People v Grant (164 AD2d 170 [1st Dept 1990], appeal dismissed 77 NY2d 926 [1991]), the police observed the defendant exit the passenger side of a car they had followed for several blocks. When the defendant exited the car, he clutched his waist; although the officer could not see a weapon or even a bulge, he drew his weapon and ordered the defendant to stop (id. at 172). The defendant began to run, and the officer gave chase with his weapon drawn. After being pursued for two blocks, the defendant threw the pistol to the ground. The gun was recovered, and the defendant was arrested (id.). This Court found that, although the officer would have been justified in approaching the defendant to request information or, at best, in approaching pursuant to the common-law right to inquire, the defendant had the right to walk or run away (id. at 173). In neither case was a pursuit permissible. Having found the police conduct unlawful, this Court concluded that the defendant's act of throwing the weapon was a spontaneous reaction to the illegal police conduct (id. at 174-176). This Court suppressed the gun, finding that the "frenetic activity of running two blocks while being chased by police cannot be said to have afforded time for a rational calculation of strategy, independent of the unlawful police action" (id. at 176).
The cases cited by the dissent involved lawful police conduct, during which the defendant had ample opportunity to contemplate his option and action to dispose of evidence, and not a situation, as here, and as in Howard, Torres and Grant, in which evidence was discarded under the pressure of an unlawful hot pursuit. For example, in People v Fields (171 AD2d 244 [1st Dept 1991], lv denied 79 NY2d 1000 [1992]) police officers, riding in an unmarked car, attempted to stop the defendant's car by blocking the street. The defendant's car, however, swerved around the police vehicle and continued to proceed (id. at 246). It stopped two blocks away without police intervention, when it was immobilized by traffic congestion. Defendant was not directed to remain in the car at that point but rather immediately took flight with a white plastic bag, the object of initial suspicion (id.). Under these circumstances, this Court found the defendant's act of jettisoning the bag containing a kilogram of cocaine beneath a bus in the course of being pursued by the police to be a considered and calculated act undertaken to assist his effort to escape and to rid himself of incriminating evidence, independent of an earlier, legal but unsuccessful attempt by the police to stop the car from which he exited (id. at 248-249).
Similarly, in People v Salva (228 AD2d 344 [1st Dept 1996], lv denied 89 NY3d 867 [1996]), this Court found that the police officers' pursuit was justified because they had a reasonable suspicion that the defendant had committed or was about to commit a crime. Seconds after hearing a gunshot from somewhere in front of their patrol car, the officers noticed a group of people looking back and forth between the patrol car and the defendant, who was walking alone across the street and was the only person walking away from the area (id. at 345). When the defendant then looked back over his shoulder and suddenly started to run, these actions elevated the police officers' founded suspicion to reasonable suspicion that defendant was connected with the gunshot (id.). As an alternative holding, this Court found that the defendant's decision to throw the gun over a chainlink fence, more than one and a half blocks away from the point where he began to run, while aware of the police officers' presence, was a calculated one, rather than a spontaneous response to the pursuit (id.). In Salva, the circumspect and calculated manner in which the defendant attempted to extricate himself from the scene was hardly the conduct indicative of coercive police pressure that could have provoked a defendant's spontaneous reaction.
We therefore conclude that the pursuit in this case was an unreasonable seizure within the meaning of the Fourth Amendment.
Accordingly, the amended judgment of Supreme Court, New York County (Arlene D. Goldberg, J.), rendered January 13, 2017, convicting defendant, after a jury trial, of criminal possession of a weapon in the second degree, and sentencing him to a term of five years, should be reversed, on the law, the motion to suppress granted, and the indictment dismissed.
All concur except Richter, J. and Tom, J. who dissent in separate Opinions.




RICHTER, J. (dissenting)


Although the majority focuses on the validity of the police pursuit of defendant, I believe we do not need to resolve this issue. Rather, I would affirm because the record supports the motion court's determination that defendant made a calculated decision to discard the firearm and his actions were not provoked by any allegedly unlawful police chase.
The hearing testimony established that on December 27, 2008, officers on anticrime patrol received a radio run of shots fired on 150th Street and Macombs Avenue, with the following description: a black male wearing a black jacket. When the call was received, the officers were five blocks south and one avenue over from the location where the shots were fired. Because the officers believed that the perpetrator would no longer be at the exact location mentioned in the radio run, they decided to drive a few blocks to 150th Street and Seventh Avenue instead of responding to the direct location. They did so because the officers concluded based on their training that the perpetrator could easily get away by cutting through the Dunbar Complex and accessing the subway station directly across from the complex. They arrived approximately two to three minutes after receiving the radio run and saw two black men, one wearing a black jacket and the other, defendant, wearing a gray jacket. The men were exiting the complex. An officer stepped out of the police vehicle and asked defendant and his companion to come over. Nothing in the record indicates that the officer had his gun drawn when he requested to speak with defendant.
Defendant did not comply with the officer's request and immediately ran away. Another [*7]officer followed defendant in the police vehicle and was "hitting the horn and the siren." When the officer made a right turn on the north side of 149th Street toward Eighth Avenue, defendant ran in front of the police vehicle, crossed over to the south side of 149th Street and proceeded to run towards Eighth Avenue. The officer in the vehicle saw defendant go under a scaffold, climb a fence, throw a black object over the fence into a locked construction site, climb back down the fence and continue to run. Defendant was subsequently arrested; the officers returned to the location where defendant had thrown the black object and retrieved the gun.
Defendant's evasive actions of running under a scaffold, climbing a fence, throwing a gun over the fence into a locked construction area, then coming back down the fence and continuing to run was not a "spontaneous reaction to a sudden and unexpected confrontation with the police" (People v Boodle, 47 NY2d 398, 404 [1979], cert denied 444 US 969 [1979]). Rather, defendant's decision to discard the gun was "a considered and calculated act undertaken to assist his effort to escape and to rid himself of incriminating evidence, independent of the earlier attempt by police to stop the [defendant]" (People v Fields, 171 AD2d 244, 249 [1st Dept 1991], lv denied 79 NY2d 1000 [1992] ["defendant's act of discarding the bag (of cocaine beneath the bus in the course of police pursuit) could hardly be characterized as a spontaneous response thereto, but rather was attenuated from the (allegedly unjustified police stop)"]; see People v Salva, 228 AD2d 344, 345 [1st Dept 1996], lv denied 89 NY2d 867 [1996] ["defendant's decision to throw the gun over a chainlink fence, over one and half blocks away from the point where he began to run, while aware of the police officers' presence, was a calculated one"]; see also People v Archer, 160 AD3d 553 [1st Dept 2018], lv denied 31 NY3d 1144 [2018]; People v Bush, 129 AD3d 537 [1st Dept 2015]; People v White, 117 AD3d 425 [1st Dept 2014], lv denied 23 NY3d 1044 [2014] [all finding that discard of contraband was a calculated act]).[FN1]
Defendant's reliance on People v Holmes (181 AD2d 27 [1st Dept 1992], affd 81 NY2d 1056 [1993]) and People v Grant (164 ADd2d 170 [1st Dept 1990]), is misplaced. In Holmes, the officers were chasing the defendant on foot and were approximately 10 feet from the defendant when he discarded the evidence. In Grant, the officer was in hot foot pursuit with a weapon drawn when the defendant simply threw a gun to a sidewalk. In the instant case, as the officer pursued defendant in a police vehicle, defendant made a calculated decision to cross in front of the police vehicle and continued to run on the south side of the street to make it harder for the police to apprehend him. Defendant decided to go under a scaffold, climbed a fence, tossed the gun over the fence, came back down the fence and continued to run away from the police. The actions of defendant were not instinctual but rather a thought-out reaction to rid himself of incriminating evidence. People v Howard (50 NY2d 583 [1980], cert denied 449 US 1023 [1980]) and People v Torres (115 AD2d 93 [1st Dept 1986]), cited by the majority, can be distinguished on their facts. In Howard, the defendant held on to the contraband during the entire foot chase and only dropped it when he attempted to open or break down the door and window in the basement to evade officers. Here, defendant did not hold on to the gun for the entire pursuit and continued to run even after making a calculated decision to discard the gun and to climb back down the fence. In Torres, during a brief police pursuit, the defendant ran into an alley, found himself blocked by a fence "with a number of policemen breathing down his neck" (115 AD2d at 99), could run no [*8]further, and discarded a gun over the fence. Here, defendant was not similarly boxed-in, and thus his discarding the weapon was not "an instinctive drive to escape his pursuers" (id.), but rather a reflective formulation of strategy.
In conclusion, defendant's evasive and calculated actions support the motion court's finding that this was a calculated and independent act (see Boodle, 47 NY2d at 404).
TOM, J. (dissenting)
Because the pursuit of defendant by the police officers was reasonable and justified (People v Martinez, 80 NY2d 444, 448 [1992]; see also People v Parker, 32 NY3d 49 [2018]), I would find that the defendant's motion to suppress was properly denied, and accordingly would affirm the conviction.
At the suppression hearing, Detective Richard Pengel testified that at approximately 9:20 P.M. on December 27, 2008, he was in the area of 145th Street and Seventh Avenue in Manhattan in plainclothes with fellow officers when they received a radio report of shots fired at 150th Street and Macombs Place. Pengel was accompanied by Officer Mansfield, Officer Matos, and Lieutenant O'Neill. The report indicated that the incident had "just happened" and a second report indicated that a man had been shot. The perpetrator was described as a black man who was wearing a black jacket.
In these situations, the officers were trained not to respond to the "direct location" of the incident but to instead "go a few blocks out" because it usually took a few minutes for information from a 911 call to be transmitted to them, by which time "the perpetrators or perpetrator would no longer be at the scene." In this case, the officers immediately drove to the entrance of the Dunbar Houses at 149th Street and Seventh Avenue, approximately one block and one Avenue from the reported shooting. They did so because they believed the perpetrator would no longer be at the scene and could have cut through the Dunbar complex to access the subway at 149th Street and Seventh Avenue in order to escape. They reached this location two or three minutes after the radio report of shots fired.
At that point, the officers observed two men walking together out of one of the entrances to the Dunbar Houses located between 149th and 150th Streets on Seventh Avenue across the Avenue from the subway entrance. One of the men fit the description of the perpetrator in that he was black and was wearing a "black bubble-type jacket." The other man - defendant - was taller, and wearing a gray jacket.
The officers decided to stop the two men because they were in the "vicinity" where the shots had been reported to have been fired, were coming away from a possible escape route of the shooting location and because the man with the defendant matched the description of the shooter. The officers believed either of the men could have been the shooter, or, alternatively, that the men could have witnessed the crime or could have been victims.
Pengel pulled his car up behind the men and stopped. Lieutenant O'Neill exited the car and said, "Hey, Buddy, ... come here." Although the man with the defendant stopped, the defendant began running. The other officers got out of the car to pursue defendant while the lieutenant stayed with the defendant's companion. Pengel drove the car south to cut off defendant and turned on his siren. Defendant ran in front of Pengel's car at one point, then underneath scaffolding at a construction site where he climbed up a fence and threw something black over the fence. The defendant then dropped down from the fence and started running again towards Eighth Avenue.
Pengel continued to chase the defendant in his car and repeatedly told him to stop. He finally stopped on 149th Street and was apprehended by Pengel and Officer Mansfield. Pengel went to the construction site and saw a gun lying on the ground, which was later recovered by other officers.
Any analysis of police conduct we undertake must focus on whether the actions taken were reasonable in view of the totality of the circumstances (see People v Batista, 88 NY2d 650 [1996]). Indeed, it is well settled jurisprudence that the touchstone of any analysis of a [*9]governmental invasion of a citizen's person under the "Fourth Amendment and the constitutional analogue of New York State is reasonableness" (People v Chestnut, 51 NY2d 14, 22, n 7 [1980], cert denied 449 US 1018 [1980]; see also People v Molnar, 98 NY2d 328, 331 [2002]).
Here, the police conduct was reasonable in light of all the circumstances. The pursuit of the defendant and his arrest took place on a winter evening after dark in an area of Manhattan, and part of Harlem, that is not heavily commercial and nothing in the record indicates it was heavily trafficked at that time. Reports of shots fired and that a person was shot was a serious and urgent matter and an ongoing threat to the safety of the area residents that warranted swift action by the police. Indeed, "[a] police officer is entitled, and in fact is duty bound, to take action on a radio call" (People v Benjamin, 51 NY2d 267, 270 [1980]).
Two or three minutes after the radio report when the officers arrived at Seventh Avenue between 149th and 150th they saw defendant and his companion, who were exiting the Dunbar housing complex, precisely the escape route their training taught them a perpetrator might take to reach the nearby subway from the scene of the shooting. Upon observing that defendant's companion matched the only description they were working with, the officers were authorized to exercise their common-law right of inquiry based on a founded suspicion that criminal activity was afoot (see People v Moore, 6 NY3d 496, 498 [2006] [officers observing individual matching description given over radio call were authorized to exercise common-law right of inquiry]).
Then, after Lieutenant O'Neill made a verbal inquiry of the men, defendant immediately began to run away. This, combined with all the circumstances, including the urgency of the situation, that this was mere minutes after the reported shooting, and the close spatial proximity to the shooting, established the reasonable suspicion justifying and warranting pursuit by the officers (see Martinez, 80 NY2d at 448 [where police have common-law right to inquire, defendant's flight, and the time and location established the necessary reasonable suspicion]; compare People v Moore, 6 NY3d at 500-501 ["to elevate the right of inquiry to the right to forcibly stop and detain, the police must obtain additional information or make additional observations of suspicious conduct sufficient to provide reasonable suspicion of criminal behavior. Had defendant, for example . . . actively fled from the police, such conduct, when added to the anonymous tip, would have raised the level of suspicion."]).
The fact that defendant was not the individual wearing a black jacket is of no moment. In Matter of Robert R. (231 AD2d 406 [1996]), we affirmed the denial of a motion to suppress a gun in analyzing circumstances similar to those raised here. In Robert R., the police were told of shots fired in a particular location and given a description of a male suspect. Officers encountered a group of males, one of whom - not the respondent - matched the given description. We held that respondent's flight combined with the other circumstances "gave rise to reasonable suspicion justifying pursuit" (id. at 407; see also People v Wider, 172 AD2d 573, 574 [2d Dept 1991] ["the report of shots fired, the quick response time (the officers arrived at the location within two or three minutes of receiving the report), the officers' observation of a group of men at the specified location, one of whom matched the description given in the report and the defendant's flight . . . all combined to provide justification for the pursuit of the defendant"]).
Further, contrary to the majority's contention, "the circumstances permitted the officers to reasonably conclude that the most likely explanation for defendant's behavior was that he had recognized them as the police" (People v Collado, 72 AD3d 614, 615 [1st Dept 2010], lv denied 15 NY3d 850 [2010]). Indeed, defendant ran the moment the Lieutenant addressed the pair, and continued to run even after Detective Pengel operated his police siren from the vehicle in pursuit.
The majority suggests that this dissent misinterpreted the record. Nothing could be further from the truth. The pursuit was justified based on the officers' testimony that one of the men could have been the shooter because defendant's companion matched the description they had, and the fact that they were the only people on the street during that winter night, together with the temporal and spatial proximity to the reported shooting, authorized them to exercise their common-law right of inquiry based on a founded suspicion that criminal activity was afoot (see People v Moore, 6 NY3d at 498; Matter of Robert R., 231 AD2d 406).
The majority attempts a sleight of hand by focusing the attention on defendant's companion wearing the black jacket - ignoring the possibility that defendant could have been an accomplice or involved in the shooting and that defendant's companion matched the given description - and instead focuses on the fact that the officers also could have thought the men could be victims or witnesses. The majority improperly isolates the stopping of the two men on the street without regard to the other significant factors, including the urgency of the reported shooting, with a possible shooting victim and the interaction between the men and the officers, the fact that defendant's companion matched the description of the shooter, and the temporal and spatial proximity, thereby avoiding the context and totality of the circumstances facing the officers in this fast-moving dangerous exchange.
By ignoring the entire context of the encounter, the majority then finds that somehow the officers only had a level one right to request information at the inception of the encounter. However, to reach this conclusion the majority turns a blind eye to the information received by the police immediately before the defendant and his companion were stopped, and ignores controlling Court of Appeals precedent establishing that under these circumstances the officers began with a level two right to inquire (see Moore, 6 NY3d at 498). Accordingly, the majority's suggestion that defendant had the right to run away is entirely erroneous. Rather, his flight combined with the other factors established the reasonable suspicion warranting pursuit.
It would be a dereliction of their official duties if the police did not pursue defendant under the circumstances and instead watched as defendant fled from the vicinity of a shooting. Once again, the cornerstone of the analysis is reasonableness and the majority's suggestion that the police did not have the right to pursue is not reasonable and is not the law.
In fact, the majority's analysis continually sidesteps the highly dangerous nature of a reported shooting and disproportionately highlights the character of the neighborhood. Critically, the police saw these men - one of whom matched the description - minutes after a reported shooting and possible shooting victim in the exact location their training taught them to search. This police action was both warranted and reasonable. The Court of Appeals recent holding in People v Parker (32 NY3d 49 [2018]) is instructive. In Parker, the defendants were indicted and jointly tried for various crimes arising from the theft of several thousand dollars at a commercial establishment. The crime occurred in the morning hours at a country club in a residential neighborhood.
In Parker, the police had received a radio transmission about a burglary in progress but were given no description of the perpetrator or perpetrators. Five minutes after the report, the police arrived at the club observed the defendants on the club's private driveway, but observed no other persons in the area. The Court of Appeals determined that at that point the police had a founded suspicion that defendants were involved with the burglary, warranting a level-two common-law inquiry.
The Court of Appeals further held that when the officers questioned the men and defendant Nonni ran and Parker made a "hurried" or "brisk" departure, the police had reasonable suspicion of criminal activity to justify the pursuit, forcible stop, and detainment of both defendants.
Here, the officers had more information about the perpetrator than the police in Parker in that they had a general description of the suspect. The majority erroneously denies this simple fact even though in Parker the police had no description of the suspects. The majority's reiteration that this incident took place in Harlem does not aid the analysis. As the majority recognizes, both here and in Parker an anonymous tip combined with other circumstances gave the police the right to make a proper common-law inquiry. However, the majority wrongfully focuses on the location of the incident rather than the relevant factual circumstances including the exigency of a shooting that justified the pursuit in this case. Indeed, the majority erroneously states that the police stopped two black men without considering the various factors, and the urgent context of the situation, that led the police to make an inquiry of the men.
Significantly, the officers in this case were dealing with a much more urgent situation [*10]involving the firing of a gun and a possible shooting victim. In both cases, there is no indication that any other persons were around when the officers observed the defendants. Regardless, in both this case and Parker the officers clearly had sufficient information warranting a level-two common-law inquiry when they arrived at the scene within minutes and observed the defendants, and that fact, combined with flight, raised the level of the interaction such that the officers could pursue and stop the defendants.
It is separately noted that while it is always helpful for the police to receive a more detailed description of suspects, that is not always possible. However, particularly in situations where officers are faced with a report of gunshots, our holdings have made clear that a general description of a perpetrator is sufficient to warrant a common-law inquiry (see People v Lacy, 104 AD3d 422 [1st Dept 2013], lv denied 21 NY3d 1005 [2013] [where police received report of shots fired and description of suspect was "black man, wearing a blue and white shirt"]). And, once again, given the spatial and temporal proximity to the location where the report indicated that shots had been fired, defendant's flight ripened the level to reasonable suspicion thus permitting police pursuit. Thus, the majority's holding is not strengthened by repeating the phrase "individualized founded suspicion" as the totality of the circumstances provided ample basis for the police to pursue defendant.
The majority describes the neighborhood as "densely populated" in order to imply that there were numerous black men in black jackets at the location where the police arrived minutes after the report of shots fired. The majority's position is without merit. The mere fact that the City of New York is highly populated does not ipso facto support the majority's implication that on a winter night in late December there were "many people" on the street of this residential neighborhood that "could have fit the vague description." This is pure speculation with no evidentiary support.
In fact, there is no record evidence that anyone else was near defendants or on the street at the time the police arrived. Based on the factual circumstances of this case, it is unlikely there would have been many people on the street who fit the given description, especially given that it was in a residential area and during a winter night after 9 P.M., as opposed to a summer evening or a morning rush hour, for example.
Contrary to the majority's contention, the circumstances here cannot be fairly described as "equivocal." Rather, given the urgent and serious situation, the spatial and temporal proximity to the reported shots fired, that defendant's companion matched the general description given and the men were exiting the complex near the shooting and the subway, the lack of the evidence of others in the area, and defendant's immediate flight, all combined to reasonably justify the pursuit of defendant.
The majority misplaces reliance on cases in which flight from police was held insufficient to give rise to reasonable suspicion (see e.g. People v Holmes, 81 NY2d 1056, 1058, [1993]). The circumstances leading to the initial police approach in those cases — unlike the circumstances that prompted the police approach here - did not give rise to a founded suspicion of criminality. In Holmes, the police were patrolling near a known narcotics location and had "merely observed [the defendant] in the daytime, talking with a group of men on a New York City street." There was no report of a crime committed. Here, the officers were investigating a serious, life threatening crime which took place minutes earlier in that area, and defendant's companion matched the description they had been given.
People v Beckett (88 AD3d 898 [2d Dept 2011]), cited by the majority, is distinguishable in that the People there failed to establish the spatial proximity between the crime and the location of the defendant. In contrast, the spatial proximity - a short distance of one block and one avenue - was clearly established in this case, and lined up with the police training about the likely path of the perpetrator.
Nor does this case bear any resemblance to Matter of Rubin M. (271 AD2d 291 [1st Dept 2000]). In Rubin M., the police approached and stopped the respondent only because "he matched the generic description of the perpetrator contained in [a] hot sheet [given to the officers [*11]in connection with a number of incidents in the 42nd Precinct], a description which could just as readily have applied to countless Bronx and Manhattan residents." Critically, unlike the circumstances here, the police in Rubin M. were not searching for a particular suspect and there was no specific crime that had just been reported in the area. Moreover, the hot sheet described a black male with a wide range of heights and weights, thus potentially subjecting many people in the area and at any time to an approach by the police.
Further, cases such as Holmes are inapposite here because this case does not involve a violation of the "right to be let alone" or the unjustified targeting of individuals who reside in what police might describe as "high crime neighborhoods" (81 NY2d at 1058). In fact, this case bears no relation to the police pursuit of an individual under equivocal circumstances such as merely standing on a corner with others. Rather, this case involved exigent circumstances, a general description of a
perpetrator and the temporal and spatial proximity that warranted the officers' actions. Therefore, contrary to the majority's position, endorsing the pursuit in this case is not tantamount to permitting the pursuit of a black person matching a general description under "equivocal circumstances." The record evidence in this case clearly bears this out.
In sum, the police conduct was reasonable and all the circumstances justified the pursuit, during which defendant discarded a gun. Thus, there was no basis to suppress the weapon recovered. However, irrespective of the legality of the pursuit, defendant's independent abandonment of contraband as he fled was an intentional relinquishment of any privacy interest, and was a strategic and calculated decision rather than a spontaneous reaction to the police activity (see People v Boodle, 47 NY2d 398, 402-404 [1979], cert denied 444 US 969 [1979]).
Accordingly, I would affirm the conviction.
Amended judgment, Supreme Court, New York County (Arlene D. Goldberg, J.), rendered January 13, 2017, reversed, on the law, the motion to suppress granted, and the indictment dismissed.
Opinion by Renwick, J.P. All concur except Richter, J. and Tom, J. who dissent in separate Opinions.
Renwick, J.P., Richter, Manzanet-Daniels, Tom, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 7, 2019
CLERK



Footnotes

Footnote 1: The police approach and pursuit of defendant took place in Harlem, a neighborhood in Upper Manhattan populated predominantly by African Americans.

Footnote 2: Justice Tom also argues, with reasoning similar to Justice Richter's, that defendant's act of throwing the gun was a calculated act of voluntary abandonment.

Footnote 1: The majority attempts to distinguish Fields and Salva based on the fact that the courts in those cases found the initial police conduct to be lawful. However, the courts also concluded, in the alternative, that regardless of the legality of the earlier police actions, the defendants had made a calculated decision to discard the contraband. Likewise here, I conclude that regardless of the lawfulness of the police pursuit, defendant abandoned the weapon.